**Brian J. Boquist**
17080 Butler Hill Road
Dallas, Oregon 97338
Phone: 503-623-7663
Email: boquist@aol.com

# ORGINAL FILING ATTACHMENT #2
# 26 July 2019

## Case No. ___6:19-cv-01163-MC___

# COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# 69 Pages

# Note

## Public Hearing Only

## Second Half – The Work Session
## Not Provided
## By Legislative Media Services Yet

## Possible Technical Error Only

2

*July 8, 2019*

*Senate Special Committee on Conduct*



CC REPORTING AND VIDEOCONFERENCING
172 East 8th Ave
Eugene, OR 97401
541-485-0111
www.ccreporting.com

SENATE SPECIAL COMMITTEE ON CONDUCT

July 8, 2019

Monday

COMMITTEE MEMBERS

Senator Floyd Prozanski - Chair

Senator James Manning

Senator Tim Knopp

Senator Alan Olsen

Transcribed from recording by:

Ms. Sara Fahey Wilson

```
 1              P R O C E E D I N G S

 2

 3              SENATOR PROZANSKI:  Good morning,

 4    everyone.  I would like to say thank you for being

 5    here.  We're going to go ahead and open up our

 6    hearing.  This is an invited testimony public

 7    hearing for the Senate Special Committee on Conduct.

 8              Today is Monday, July 8th.  And before

 9    we get started, I wanted to kind of go over a few

10    things as to how we're going to be proceeding today.

11              This is -- and give some

12    clarification.  I've seen some of the reports in the

13    media, and I believe that there's been some

14    confusion that has gone forward.

15              But before I get to -- first what I

16    want to do is thank Senator Olsen, who is stepping

17    in and subbing in for Senator Thatcher today.

18    Because of the timing of the committee, she had

19    already had other obligations that she could not

20    break from, and so, Senator Olsen, thank you very

21    much for being part of the committee.

22              The purpose of the hearing today is to

23    determine if the statements that were made by

24    Senator Boquist on June 19th of this year towards

25    President Courtney on the floor as well as
```

 1    statements that were made shortly thereafter toward

 2    the state police as to whether or not they

 3    constitute a credible threat of violence, and

 4    whether those statements have caused members of the

 5    Oregon State Legislature or the branch employees to

 6    report concerns including for safety and the

 7    well-being of themselves and others and to subject

 8    themselves to intimidation and/or a hostile work

 9    environment.

10              The reports that are -- that people

11    are fearful and scared of coming to work,

12    investigator has made these recommendations as to

13    being -- and the reports to be credible.

14              We will be determining whether or not

15    the committee agrees with this, and at this point

16    looking at what, if any, recommendations that we'll

17    move forward with.  The recommendations that have

18    been -- has come from the report from the reporter

19    is that immediate measures shall be taken to ensure

20    that the capital is free from threats of or actual

21    violence and intimidation.

22              Recommends -- also she recommended

23    that now allowing Senator Boquist access to the

24    workplace based on his statements from June 19th

25    until the legislative branch can determine that

1    Senator Boquist will not carry out or incite others

2    to carry out the violence suggested in those

3    statements within the workplace, toward the branch

4    investigating those reports.

5            So today I want to make certain

6    everyone understands that today's hearing is to

7    determine whether or not Senator Boquist violated --

8    is not to determine whether Senator Boquist violated

9    Rule 27 but, instead, to determine whether or not

10   the state -- the Senate should impose restrictions

11   or conditions on Senator Boquist while the -- to

12   allow for the workplace to be safe and free from any

13   type of allegations of -- based on fear or

14   threatened violence in the workplace.

15           Today's hearing is not a judicial or a

16   court proceeding but, instead, is a legislative

17   committee hearing.  The committee will, in fact, be

18   taking invited testimony.  We will provide Senator

19   Boquist an opportunity to address the committee if

20   he would like to as to posing any current threat of

21   violence in the workplace that would cause Senator

22   Boquist to be denied access to the capital.

23           There will potentially be a work

24   session today.  That will be determined as we go

25   through this process.  And at that point if we are,

```
 1    we will be considering some suggested motions,
 2    potentially alternative motions, and also whatever
 3    other matters that we want to take up.
 4              I do want to put on the record as well
 5    two things.  First of all, I have had conversations
 6    with Senator Boquist since the conduct committee was
 7    posted to have this hearing.  During that time, at
 8    one point I used the term "complaint," when I
 9    probably should have been using the term "reports."
10              As I stated in an email to him, I'm
11    not really familiar with the employment law area.
12    My practice of law is as a prosecutor in criminal
13    law.  So I more than likely misused the term
14    "complaints," when it should have been the term
15    "reports."
16              I believe that, in fact, has caused
17    some people some confusion, so I wanted to put the
18    record -- set the record straight.
19              The last thing I want to put on the record
20    is the delay in the hearing date of today.  These
21    statements were, in fact, made on June 19th.  For
22    most of the individuals in this room probably knows
23    that there was a protest within the Senate where
24    Republican members left the following day for about
25    nine to ten days, and then by the time we got back
```

1    and finished our work was on June 29th and June

2    30th, and so this was the first opportunity, being

3    today, to get all of the committee members together

4    to be able to go forward.

5                    So with that, I wanted to see if

6    anyone has any opening statements from the

7    committee.

8                    Senator Olsen?

9                    SENATOR OLSEN:  No, sir.

10                   SENATOR PROZANSKI:  Senator Knopp,

11   Senator Manning?

12                   All right.  All right.  Now, at this

13   point what we're going to do is the formality, and

14   that is organizing our meeting.  And we have a set

15   of -- do we have the --

16                   UNIDENTIFIED SPEAKER:  Everybody has a

17   hard copy of the committee rules.

18                   SENATOR PROZANSKI:  Okay.  So I'm

19   going to ask for Senator Knopp, if you will make a

20   motion on the adoption of the special -- the Senate

21   Special Committee on Conduct's interim rules.

22                   SENATOR KNOPP:  Mr. Chair, I move to

23   adopt the Senate Special Committee on Conduct

24   2019-2020 interim rules.

25                   SENATOR PROZANSKI:  All right.

1   Senator Knopp moves for the adoption of the Senate

2   Special Committee on Conduct 2019-'20 interim rules.

3   Is there any questions?

4                      Any objections?

5                      So ordered.

6                      Now, at this point what we're going to

7   do is open up for our public hearing.  As I said,

8   this will be -- as noted, it will be invited

9   testimony.  And at this point I think we'll ask for

10  -- and I'm not sure if we want Jessica Nieling to

11  come up with Brenda Bumgart -- I'm not sure how we

12  want to proceed on that.

13                      Brenda, why don't you just go ahead

14  and come on up.  So we're going to start with

15  Ms. Burkhart's -- Bumgart's testimony.

16                      And I want to thank you for being

17  here.  If you'd be so kind as to put your name on

18  the record, and then I think what would be best is

19  for you to start off as an overview and giving us a

20  context of how your firm, Stole Reeves, became

21  involved in this matter.

22                      MS. BUMGART:  Thank you.  Good

23  morning, Chair Prozanski, members of the committee.

24  For the record, my name is Brenda Bumgart.  I'm a

25  partner at the Stole Reeves firm in Portland Oregon.

1    Thank you for inviting me to speak with you this

2    morning.

3                    How I became involved in this matter

4    is in March of this year my firm was contracted by

5    the branch to serve as an outside investigator to

6    handle matters with respect to personnel Rule 27.

7    That contract is a public record.  It was effective

8    March 25th, 2019, and that sets forth the scope of

9    my firm's services, including my services to the

10   branch.

11                   In essence, I have been retained as

12   outside counsel, and that's the capacity in which I

13   serve before you today and the role that I undertook

14   when I issued my June 25th memorandum.

15                   SENATOR PROZANSKI:  All right.

16                   MS. BUMGART:  The contract -- I just

17   want to point out, Chair Prozanski and members, it

18   talks about the scope of the services -- and this is

19   on page 2 and 3 -- that the role of myself and my

20   firm shall be with respect to assessment, to assist

21   the branch with assessing matters, concerns, or

22   complaints brought forward by employees under Rule

23   27, evaluation of those concerns in which we are

24   called upon to exercise our expertise and our

25   judgment and our experience in consultation with the

1  branch, and then finally should there be a need for

2  a formal investigation under Rule 27, we would serve

3  in that role as an outside investigator, issue a

4  formal finding and recommendation.

5          SENATOR PROZANSKI:  Okay.  Thank you.

6          And did you have reason to issue a --

7  what's titled Confidential Memorandum to Jessica

8  Nieling and Dexter Johnson dated June 25th?

9          MS. BUMGART:  I did -- I did, Chair

10  Prozanski.  And would you like me to speak to the

11  impetus for that?

12          SENATOR PROZANSKI:  Yes.  My

13  understanding, just for the record, regarding

14  Senator Boquist's, slash, interim findings --

15  finding and recommendations.

16          MS. BUMGART:  Correct.  So my memo is,

17  as you referenced -- is dated June 25th, 2019.  I'm

18  hopeful that that speaks for itself.

19          On about June 19th I began receiving

20  reports with respect to the senator's comments that

21  the chair referenced earlier on the Senate floor

22  directed to President Courtney and then shortly

23  thereafter to the media.  The reports, as I

24  understood them, were continuing to come in in

25  somewhat of a flurry.  They included reports from

1    appointing authorities who have an obligation to

2    report concerns that conduct may violate Rule 27,

3    concerns from staff, and concerns from members.

4              My immediate response to the branch as

5    outside counsel was -- excuse me -- what steps --

6    are the branch -- is the branch taking to ensure

7    that these threats will not be carried out in the

8    workplace and/or that employees are not continuing

9    to be subjected to an intimidating, hostile, or

10   perceived unsafe workplace while this is ongoing.

11             So in the course of that, I saw it fit

12   to issue this interim finding and recommendation

13   that -- that pointed out the egregiousness of the

14   conduct.  The -- my findings were based purely on

15   those two public statements.  I reviewed personally

16   the statements made by Senator Boquist on the floor

17   of the Senate.  I watched that on OLIS.  I reviewed

18   the statements to KGW reporter, Pat Dorris, and

19   those were the facts on which I relied upon to make

20   this recommendation.

21             I would also add that my

22   recommendation would be the same whether or not I

23   found a facial violation of Rule 27.  This

24   investigation is ongoing.  I did issue an interim

25   finding because I do believe that those statements

13

1   on their face run afoul of Rule 27, which is quite

2   broad, and talks about preventing a work environment

3   that is unsafe, intimidating, and hostile.

4                  Workplace harassment under Rule 27 is

5   defined more broadly than unlawful harassment under

6   ORS 659(a).  And my recommendation would be the

7   same.

8                  I would also add that my

9   recommendation -- I understand that we're dealing

10  with a different set of circumstances here in the

11  public setting, and with respect to the conduct of a

12  sitting senator who does have certain First

13  Amendment rights.  I'm not here to speak about

14  those.  That's not my role.

15                 But I -- in taking a step back and

16  looking at the obligation of the branch to ensure

17  that its employees, members of the branch, members

18  of the public who walk through these doors every

19  day, are not going to be subjected to a workplace

20  that is -- where they feel there are threats of

21  violence, or that is intimidating or unsafe, that is

22  the immediate cause for concern that resulted in my

23  June 25th memorandum.

24                 SENATOR PROZANSKI:  All right.  Do you

25  have anything else you'd like to add at this time?

14

1    I'm going to open it up for questions.

2              MS. BUMGART:  I would just add that --

3    that really in any workplace this is standard

4    operating procedure, that if there are reported

5    threats of violence, or even less -- oftentimes if

6    there are reports of threatened retaliation, that is

7    prudent for the employer to take an interim step,

8    which is not disciplinary.  It's -- it is merely to

9    Band-Aid the situation to ensure that the employer

10   has an opportunity to look into the concerns that

11   are raised, to reach conclusions about them, and

12   then to take prompt remedial measures to ensure that

13   this conduct isn't either carried out in the

14   workplace or that it curbs that conduct.

15             So if -- I understand we have a unique

16   situation here, and there are other factors in play,

17   but if we are looking at this through the lens of

18   what an employer's obligated to do, under the law,

19   under Rule 27, the branch has this obligation just

20   the same, I believe.

21             SENATOR PROZANSKI:  All right.  Thank

22   you.

23             For clarification, let me just start

24   with that because -- since we're all on that

25   subject.  It's my understanding that based on other

15

 1    issues of conduct, not including -- not representing

 2    Senator Boquist, but prior issues that have occurred

 3    in this building, there had been a BOLI agreement

 4    and settlement in the Jeff Cruz matter, and that at

 5    that point my understanding is that BOLI did, in

 6    fact, identify us as a legislative branch to be

 7    basically an equivalent of an employer and having

 8    the same duties and obligations as a private

 9    employer would have in their workplace.

10              MS. BUMGART:  I think that's correct,

11    Senator, and that certainly is part of the backdrop

12    with which I approached my -- my obligations to the

13    branch today coming out of that BOLI settlement,

14    ensuring that there is compliance with that and that

15    there is compliance with Rule 27.

16              SENATOR PROZANSKI:  All right.  Thank

17    you.

18              I'm going to open up for questions for

19    Ms. Bumgart.  First, Senator Manning had his hand up

20    first, and then we'll come back to Senator Knopp.

21              SENATOR MANNING:  Thank you.  Thank

22    you, Mr. Chair.

23              Ms. Bumgart, thank you for being here

24    this morning.  Just a general question.  I think you

25    had mentioned that there were other complaints.

| | |
|---|---|
| 1 | Without identifying who complained or anything, what |
| 2 | was the number of complaints, if that's permissible? |
| 3 | MS. BUMGART:  So, Chair Prozanski, |
| 4 | Senator Manning, and members, I would answer it this |
| 5 | way.  I think that given the ongoing nature of this |
| 6 | investigation, and I would say that I'm at the |
| 7 | outset of the intake procedure, I am continuing to |
| 8 | receive reports.  I have not yet made an evaluation |
| 9 | whether those are formal or informal under Rule 27, |
| 10 | whether one or more of them will proceed with me |
| 11 | conducting a formal outside investigation. |
| 12 | If that is the case, of course, the |
| 13 | protocol of Rule 27 will be followed.  Senator |
| 14 | Boquist at some point would be entitled to those |
| 15 | formal complaints.  He, of course, will -- I will |
| 16 | invite a meeting with him to discuss -- I mean, that |
| 17 | process will be followed. |
| 18 | At this point I would say I don't know |
| 19 | that I can give you an exact number, but there are |
| 20 | multiple.  And the concerns, also, are beyond these |
| 21 | statements.  There are other concerns that are being |
| 22 | raised as well.  But I think for purposes of |
| 23 | protecting the integrity of the investigation, |
| 24 | that's probably as comfortable as I am going today |
| 25 | unless, of course, the committee would like to hear |

1   more.

2                   I'm trying to balance those interests

3   and maintain the integrity of the investigation for

4   both the senator and those involved in bringing the

5   concerns forward.

6                   SENATOR PROZANSKI:   All right.   Thank

7   you.   Senator Knopp?

8                   SENATOR KNOPP:   Thank you, Mr. Chair,

9   I have multiple questions.

10                  So, Brenda, as -- as you engaged in

11  looking at these statements, did you interview

12  Senator Boquist?

13                  MS. BUMGART:   Mr. Chair and Senator

14  Knopp, I did not.   I certainly thought about that

15  because that is typically a normal process.   Before

16  there is a finding, or certainly a conclusion of the

17  investigation, it is normal process, of course, to

18  interview the individual about whose behavior is at

19  issue.

20                  I did not here, solely because I made

21  my recommendation -- my finding and my

22  recommendation based solely on those public

23  statements which I found to be irrefutable.   And,

24  frankly -- and one thing I should point out -- this

25  is about the effect on the recipients' intent in

18

1    these sorts of employment situations.  Whether or

2    not a hostile or intimidating workplace is created,

3    the intent of the actor, if you will, doesn't drive

4    that inquiry.  It's the effect on the recipients.

5                    And both the law and Rule 27 talk

6    about the perspective of the reasonable person.  So

7    from my review of those two statements on the Senate

8    floor and then to the KGW reporter, I believe those

9    sufficient, and my recommendation is based solely on

10   those facts.

11                   SENATOR KNOPP:  Follow-up?

12                   SENATOR PROZANSKI:  Yes.

13                   SENATOR KNOPP:  Thank you, Mr. Chair.

14                   Brenda, is -- there is no formal

15   complaint currently.  Is that correct?

16                   MS. BUMGART:  Mr. Chair, and Senator

17   Knopp my -- a formal complaint, if we are talking

18   about in terms of Rule 27-6, I have not yet done an

19   intake procedure and made a determination that a

20   complaint is elevated to the formal level that the

21   individual would like to proceed down that road.  We

22   certainly have complaints, reports, if you will,

23   that may evolve into that.  I think what's important

24   is that when I issued the June 25th memorandum, it

25   was not linked to any informal or formal complaint.

```
 1    It was based on reports, some of which just came
 2    orally to me.
 3                SENATOR PROZANSKI:  Follow-up?
 4                SENATOR KNOPP:  Thank you, Mr. Chair.
 5                So, Brenda, the -- the reports that
 6    came to you, did -- did the Oregon State Police or
 7    the Senate president -- were they part of those
 8    reports?  Did they make reports in this case?
 9                MS. BUMGART:  I did not receive any
10    reports from the Oregon State Police.  I'm aware
11    generally, and I think after the issuance of my
12    memorandum, that they did have some communication,
13    obviously, with the branch.  They were undertaking
14    their own assessment of the threat to the branch.
15    They were involved.  But I have not had any direct
16    communication or received any reports from the
17    Oregon State Police.
18                And the same, I believe, from the
19    Senate president's office.  I saw some public -- I
20    think two public memorandums issued, one jointly by
21    President Courtney and Speaker Kotek, and then
22    another memorandum from the branch.
23                SENATOR KNOPP:  Thank you.
24                MS. BUMGART:  Thank you.
25                SENATOR PROZANSKI:  Senator Olsen?
```

20

July 8, 2019

18

1        SENATOR OLSEN:  Thank you very much,

2    Mr. Chair.  And thank you very much for the opening

3    comments.  It's a pleasure to be here.

4            Ms. Bumgart, in your June 25th

5    memorandum you state, on their face, they constitute

6    credible threats of violence.

7            Is that your opinion or is that a

8    fact?

9            MS. BUMGART:  I think my opinion

10   primarily, although I think both Senator -- and I

11   want to be clear I am not a criminal lawyer.  I'm

12   not making an assessment whether or not these

13   threats in combination or on their own rose to some

14   level of criminal behavior.  That's not -- that's

15   not my scope.

16           What I mean by credible threats is

17   this is not a situation of a he-said/she-said.  For

18   example, I did not receive this information that

19   someone reported that Senator Boquist had made these

20   statements or had -- you know, where we have

21   secondhand information.  These were statements that

22   I observed that he made -- that he made publicly.

23           So from my perspective, from the

24   employment perspective, that -- where you have an

25   employee of the branch who has gone on record

21

1     publicly and made these statements, and at least by

2     the time I had issued my memorandum, and I think

3     currently as we sit here today those have not been

4     recanted, that was the basis of my use of the term

5     "credible threats" there, Senator.

6                    SENATOR PROZANSKI:  Follow-up?

7                    SENATOR OLSEN:  Yes.  Thank you.

8                    So I really want to be clear.  This

9     was your opinion that this was a credible threat?

10                   MS. BUMGART:  I think I said it's

11    both.  I think it's my opinion in my role as an

12    outside investigator retained employment attorney

13    for the branch to look into concerns brought under

14    Rule 27.  And I think that -- I guess I would follow

15    that with when viewing the statements as they were

16    made, I think on their face they are credible

17    threats, factually.

18                   SENATOR PROZANSKI:  Follow-up?

19                   SENATOR OLSEN:  Yes, thank you very

20    much.

21                   You also state that these threats of

22    violence directly have caused members and branch

23    employees to report concerns -- and I quote this

24    from your memorandum -- but you stated that you

25    don't know how many members there are and what

1    branch employees, so aren't we a little bit

2    premature being here if your report and your

3    investigation is not complete?

4                    Since we don't know the number of

5    members, you stated that there's been no formal

6    complaint, so aren't we a little bit premature being

7    here?

8                    MS. BUMGART:  Chair Prozanski, Senator

9    Olsen, I don't think we're premature at all.  In

10   fact, I think if we could evolve in having this

11   conversation on June 20th, that would have been in

12   the best interests of the branch from the risk

13   perspective where I sit.

14                   The point about this recommendation is

15   that -- and I would do this the same for any client,

16   for any employer -- if reports are brought forward

17   by employees that they have a concern about the

18   safety and well-being of themselves or others in the

19   workplace, whether those are threats based on

20   threats of violence, whether they are threats of

21   intimidation, whether they are threats of

22   retaliation, it is incumbent upon the employer to

23   evaluate what, if any, steps it must take

24   immediately to ensure that these employees are not

25   further subjected to this while it has the

1    opportunity to look into it and reach some

2    conclusions and then decide what, if any, steps it

3    will take.

4            So I would say we are not premature

5    because I believe, as Senator Prozanski set forth at

6    the outset of the meeting, that my understanding of

7    our purposes here today is not to -- is not to

8    explore -- this is an interim finding.  The

9    investigation is ongoing.  At some point I expect we

10   will be back together and talking about a formal

11   finding and recommendation.  But until that point, I

12   would urge the branch to focus on the

13   recommendation, what steps it sees fit to take to

14   ensure that it may maintain an intimidating --

15   intimidation-free and safe work environment while

16   this investigation is -- is concluded.

17           SENATOR OLSEN:  Follow up?

18           SENATOR PROZANSKI:  Yes.

19           SENATOR OLSEN:  Thank you.  Thank you

20   for the latitude, I appreciate it.

21           SENATOR PROZANSKI:  You bet.

22           SENATOR OLSEN:  It's interesting that

23   you -- that -- your statement is correct, we need to

24   have a harassment-free workplace.  We need to have

25   an environment where we can all certainly work and

24

 1    not be afraid to be here.  But it concerns me that

 2    this action is moving forward with respect to

 3    Senator Boquist and his statements but yet you can't

 4    tell us who has brought in a complaint or who has

 5    told you that they have concerns.

 6              And that bothers me in the fact that

 7    we are moving an issue forward without a statutory

 8    statement from anyone stating that I'm concerned.

 9    And I don't see that in your report.  You just state

10    that violence has caused members and branch

11    employees to report concerns.

12              Well, that being said, we should be

13    able to ask those members what their concern is.

14    Was it a concern of violence?  Was it a concern that

15    we'd have more state police in the building?  What

16    exactly was the concern?  So we're moving this --

17    this -- this issue forward without full

18    documentation, without full evidentiary evidence to

19    sustain what we're going to talk about.

20              Can you talk to that?

21              MS. BUMGART:  Yes.  Mr. Chair and

22    Senator Olsen and members, I'm happy to speak more

23    about this.

24              One is I don't view this situation,

25    and particularly our discussion here today and why

1   we're here, as -- we are not -- the investigation

2   has not been concluded, and I don't believe this

3   type of situation would be in the best interest of

4   the branch to wait a month or two from now until

5   that is done where you can have the full report as

6   to who raised concerns.

7           I think that this type of situation is

8   grave, it is egregious, it is serious, it is one

9   that puts the branch at risk if it does not look at

10  this from where you sit today and decide what, if

11  any, interim measures -- interim measures need to be

12  taken to again ensure that employees are not

13  continued to be subjected to an intimidating or

14  unsafe work environment.

15          I would also add, because I hear in

16  your question the concern that, well, who is the

17  individual?  What might their motivations be, if

18  that's really what you're getting at?  And again,

19  that will be vetted in the investigation.

20          And to the extent that they are -- you

21  know, that these are somehow not credible reports,

22  that will be vetted.  But I don't think that will be

23  the case.

24          And let me follow that by saying even

25  without any employer reports, let's assume for a

26

1    moment that these statements were made on the Senate

2    floor and then shortly thereafter to the reporter,

3    and no employee came forward, no appointing

4    authority, no employee came forward.  Why?  Might

5    that be their concern for their own safety?  They

6    are concerned about retaliation?  My recommendation

7    would be the exact same.

8                The branch knows now.  It has reason

9    to know that there could be threats of violence

10   carried out in its workplace; that it could be

11   maintaining a workplace that is subjecting employees

12   to intimidation, fear.  My recommendation would be

13   the exact same.

14               So I'd encourage the committee not to

15   focus on the who, or the what, or the why, but on

16   the comments made and the obligation of the branch

17   as the employer to take interim steps to make sure

18   that its workplace is safe and free of intimidation.

19               I hope that answers your question.

20               SENATOR PROZANSKI:  Can I just follow

21   up on that, the last part?  During the

22   investigation, would you add that to your statement

23   in the sense of taking steps that are reasonable and

24   necessary during this investigation that's broader

25   than this interim step that you've brought to us?

1              MS. BUMGART:  Chair Prozanski, is your

2      question are there other recommendations?

3              SENATOR PROZANSKI:  No.  I just -- in

4      the sense of what my understanding is and what I'm

5      trying to ensure is that we're here today to

6      determine what, if any, interim steps we need to

7      take as a body to ensure a workplace that's free of

8      intimidation and threats, and that's based on the

9      ongoing investigation that you're doing now, that at

10     some point you're going to make determinations as to

11     whether the reports that you received are going to

12     move forward as either informal or formal

13     complaints?

14              MS. BUMGART:  Correct.

15              SENATOR PROZANSKI:  But while you're

16     doing that, there still is a need for the

17     employer -- in this case the legislative branch --

18     to ensure the workplace is free of those concerns?

19              MS. BUMGART:  Yes, I think that's --

20     that is correct.  And again, this is a fairly common

21     interim measure for employers to take.  This is not

22     something out of the blue.  This is really a

23     no-brainer in these kinds of situations.  And that

24     is to the extent there have been these allegations,

25     in order to ensure that the integrity -- in order to

28

```
 1   ensure the integrity of the investigation, in order
 2   to ensure that employees are not subjected to
 3   further fear for their safety, a workplace that they
 4   perceive to be intimidating or harassing, these are
 5   common steps that are taken to put the alleged --
 6   the person about -- the person whose conduct is at
 7   issue, to put them out on a administrative leave.
 8              And I understand that has other
 9   implications here.  And certainly when I was
10   evaluating this in -- in or around the time the
11   comments were made, and before making my
12   recommendation, some of the questions I had is,
13   yeah, my concern is really about protecting the
14   workplace.  And I'm not making an opinion about
15   whether Senator Boquist would be allowed to continue
16   to do his job or not, and if so, in what fashion.
17              Some of the questions I pose:  Might he be
18   able to continue to vote or do other things but just
19   remotely so?  This is, again, a very common
20   situation.  I understand the overlay here makes it
21   more difficult, but that is not a reason for the
22   branch -- the branch not to -- not to act.
23              And I would just add that the other, you
24   know, sort of what is the risk to the branch apart
25   from the obvious to the extent there are, you know,
```

```
 1    threats of violence, I think we can all understand
 2    that, but some more nuanced employment threats if
 3    the branch does not consider and take reasonable
 4    steps to ensure that it will maintain a safe and
 5    harassment-free workplace during this period of
 6    employment concerns.
 7              Are employees still coming to work and are
 8    they working in an environment where they believe
 9    they are subjected to a stressful workplace, a
10    hostile workplace, an intimidating workplace?  I
11    mean, those can and do result in workers'
12    compensation claims.  There is opportunities then
13    for further risk of retaliation.  Those sorts of
14    things.
15              So those are general concerns employers
16    have in these situations where there has been an
17    issue, it's been brought to the forefront, there's a
18    process by which it needs to be vetted, and before
19    those conclusions are made sometimes there needs to
20    be interim steps taken.
21              SENATOR PROZANSKI:  All right.  Thank
22    you.  Senator Olsen?
23              SENATOR OLSEN:  Thank you, Mr. Chair.
24    Since we're not in session any longer, the absence
25    of all senators, does that relieve some of the
```

30

```
 1   tension in the workplace?
 2                MS. BUMGART:  Mr. Chair, Senator
 3   Olsen, I think that's a fair question.  I think
 4   it's -- it probably does, to an extent, take away
 5   some of the immediate concern apart from if the
 6   Senate was in session and Senator Boquist was going
 7   to be walking on the floor.  But I don't view it as
 8   something that should be dispositive of this
 9   committee or the Senate's decision with respect to
10   this matter.
11                I mean, it's a bit fortuitous, if you
12   will, that time has passed, but the threats are the
13   same, and I would encourage this committee to
14   consider them in what steps it may take in response,
15   the same as if we were having this discussion on
16   June 20th and the session was still ongoing.
17                And that is because, you know, the
18   statements were made, the investigation needs to
19   proceed, and I don't believe they become any less
20   serious due to the passage of time.
21                And I would couple that with I don't
22   believe I have seen -- at least again at the time I
23   issued my June 25th memorandum and to the present --
24   a statement by Senator Boquist that was somehow --
25   expressed remorse, recant these statements, provide
```

1  other assurances in that respect that might --

2  again, I don't think that would be dispositive.

3  That might be some factors that the committee would

4  take into consideration.

5              SENATOR PROZANSKI:  Follow-up?

6              SENATOR OLSEN:  Yes.  Thank you very

7  much.

8              That being said, in an everyday

9  workplace, not the -- per se the capital -- but in

10  an everyday workplace, if a derogatory statement or

11  an inflective statement against a boss or some other

12  employer is made and that boss or employee just

13  shrugged it off, would you, in fact, do the same

14  process you're doing now saying that this man made

15  -- or woman made a report or made a statement

16  against a person and they don't care?  They didn't

17  make a reporting incident?  They didn't say it

18  offended them?  Would you, in fact -- as an attorney

19  for this type of thing, would you, in fact, do an

20  investigation on that statement?

21             MS. BUMGART:  Mr. Chair, Senator

22  Olsen, I think that's a fair question.  It would

23  depend on the facts and circumstances, but

24  oftentimes we see that in the employment setting

25  where the recipient of the conduct or the comment,

```
 1   maybe they have thicker skin.  They don't want to
 2   become involved.  They don't want to bring the
 3   report forward.
 4                 An employer, if it knows or has reason
 5   to know of conduct that either violates its rules or
 6   policies or rises to the level of violating the law,
 7   would have the same obligation to look into those
 8   concerns.
 9                 SENATOR PROZANSKI:  Let me just follow
10   up on that.
11                 SENATOR OLSEN:  Yeah, please.
12                 SENATOR PROZANSKI:  So what I'm
13   hearing, it's not a subjective test of what the
14   individual recipient is feeling or takes in.  It's a
15   reasonable person test, I believe you made reference
16   to, as to the workplace, as to whether a reasonable
17   person in a similar situation could fear as
18   violence, threats, or whatever, within the
19   workplace?
20                 MS. BUMGART:  Yes, Mr. Chair, it
21   really is under Oregon law, and I think it's set
22   forth in Rule 27.  It is the reasonable person test,
23   right.  It's not every slight in the employment
24   setting that's going to rise to the level of a
25   full-stop investigation or someone being disciplined
```

1    or anything like that.  But the law looks at -- the

2    reasonable person test is a balance between

3    objective and subjective factors, with the

4    reasonable person in that employee situation given

5    power differentials, someone's race, someone's

6    ethnicity, someone's gender.  Depending on the type

7    of allegations, would they believe or find these

8    conditions to be sufficiently severe or pervasive to

9    alter the terms and conditions of their workplace?

10   That's how we look at that, for example, in a

11   hostile work environment setting.

12                   SENATOR PROZANSKI:  All right.

13                   SENATOR OLSEN:  I do have other

14   questions, but I'll wait for someone else.

15                   SENATOR PROZANSKI:  All right.

16   Senator Knopp?

17                   SENATOR KNOPP:  Thank you, Mr. Chair.

18                   Brenda, you state in your report

19   accordingly, and given the gravity of the situation

20   as pertaining to threats of violence in the

21   workplace -- can you tell me from the two statements

22   where there is threats of violence in the workplace?

23                   MS. BUMGART:  Yes.  Mr. Chair, Senator

24   Knopp, from my perspective, the first statement

25   which was made on the Senate floor and directed to

| | |
|---|---|
| 1 | the Senate president that -- I think the statement |
| 2 | was along the lines of "Hell is coming to visit you |
| 3 | personally." Given where that statement was made, |
| 4 | the breadth of it -- again, I'm not -- I'm not an |
| 5 | investigator with the Oregon State Police. I'm not |
| 6 | a criminal lawyer. But from an employment setting, |
| 7 | you have a -- you have staff sitting on the dais. |
| 8 | You have other members. You have public coming in |
| 9 | and out of the workplace. That to me is a threat |
| 10 | that is made in the workplace and pertains to the |
| 11 | workplace. |
| 12 | SENATOR PROZANSKI: Follow-up? |
| 13 | SENATOR KNOPP: Yes. Brenda, I |
| 14 | believe you said that you did not interview Senator |
| 15 | Boquist, so how can you determine what his |
| 16 | definition of "hell is coming to visit you |
| 17 | personally" means? |
| 18 | MS. BUMGART: Mr. Chair, Senator |
| 19 | Knopp, I did not interview him, that is correct, and |
| 20 | I made no attempt to -- to make any finding of what |
| 21 | he meant by that. I just went purely off the public |
| 22 | statement made. And in this case, we did have |
| 23 | reports that -- that that statement, as well as the |
| 24 | statement to the Oregon State Police, were causing |
| 25 | employees to report concern about coming to work at |

1    the capital and fear for their safety and the safety

2    of others.

3                    SENATOR KNOPP:  Mr. Chair.

4                    SENATOR PROZANSKI:  Yes?

5                    SENATOR KNOPP:  So if we -- it's my

6    understanding -- and I believe I saw -- Senator

7    Boquist apologize for that statement on the floor.

8    Were you aware of that?

9                    MS. BUMGART:  I did watch -- excuse

10   me.  Mr. Chair, Senator Knopp, yes, I did watch, I

11   think, the whole segment on OLIS.  And what I recall

12   -- and I probably won't get it verbatim -- was an

13   apology to the Senate president but not to the

14   remainder of the members.

15                   SENATOR KNOPP:  Well, his statement --

16   was his statement not directed at the Senate

17   president?

18                   MS. BUMGART:  Mr. Chair, Senator

19   Knopp, I think the statement speaks for itself, and

20   -- I think that it speaks for itself.  I don't need

21   to make any interpretation about the statement.  I

22   purely relied on that statement.  I watched the

23   statement.  I watched the entirety of his statement.

24                   SENATOR PROZANSKI:  Follow-up?

25                   SENATOR KNOPP:  Yeah.  So, Brenda, in

1      your report it stays the statement on the Senate

2      floor directed to President Courtney.  Correct?

3                     MS. BUMGART:  You're referring to the

4      first bullet point?

5                     SENATOR KNOPP:  Uh-huh.

6                     MS. BUMGART:  Yes, that is what it

7      says.

8                     SENATOR KNOPP:  Okay.  Thank you.

9                     SENATOR PROZANSKI:  Senator Manning?

10                    SENATOR MANNING:  Thank you,

11     Mr. Chair.  I -- my experience in the workplace, I

12     have -- first let me make a comment.  And then I

13     have a couple of questions.

14                    I've known an employer or employees

15     that have come in to certain types of activities

16     where the employer thought it best that they be

17     removed from the premises pending an investigation.

18     Not uncommon.  I don't think that this is one of

19     those things that is not uncommon.

20                    When you look at the gravity of what

21     we're looking at, there was an indication that says

22     since we are out of session, there are no senators

23     in the building, there are employees that are still

24     here in the building.  And not knowing who all may

25     have made a report or claim, there is a possibility

1   that some of those same people would still be moving

2   in the building and, perhaps there is an opportunity

3   for interaction contact which would put us back in

4   the same place that you had mentioned, unhealthy,

5   uneasy, or whatever the case may be.  And we may be

6   subject to -- under those circumstances, if nothing

7   is done and contact is -- even though people have

8   made reports, formal, informal, to be determined,

9   and something does happen, we don't know.  What is

10  the liability of this body?  What is our

11  responsibility to do nothing?

12          MS. BUMGART:  Thank you.  Mr. Chair,

13  Senator Manning, that is exactly the concern I had

14  in reaching out to the branch and issuing this

15  memorandum.  The worst position for the branch,

16  knowing -- in light of these statements and

17  following them and knowing that employees had

18  expressed concern -- is to do nothing.

19          And the risk, of course, which is

20  everyone's hope that this is not the case, but it

21  does happen in some employment settings, and there

22  are a couple reported cases in Oregon -- if the

23  branch does nothing and knows or has reason to know

24  about these threats or concerns, there's -- there is

25  risk for negligent retention, wrongful death, all

38

1    sorts of claims.  There could be statutory

2    employment claims, like I mentioned, workers'

3    compensation claims, retaliation, those sorts of

4    things.

5              So there is an obligation upon the

6    branch to act, and that really is the legal position

7    from which I was coming, that as outside counsel, I

8    believed it incumbent upon me to advise the branch

9    of these risks.

10             SENATOR MANNING:  Follow-up,

11   Mr. Chair?

12             So based on the BOLI findings that we

13   got that were against -- talking about workplace

14   harassment, sexual harassment, all these things,

15   would this also fall up under that report in terms

16   of saying that there was an incident that happened

17   and apparently the legislators didn't move fast

18   enough or did nothing, and we are kind of, sort of,

19   in a similar situation.  I think there was a fine

20   that was paid out.

21             Would this undressed, doing nothing --

22   would this also fall up under a violation of that

23   BOLI report?

24             MS. BUMGART:  Chair Prozanski, Senator

25   Manning, that is a very good question.  I have

1    reviewed the BOLI settlement conciliation agreement.

2    I don't know that I'm in a position to make -- to

3    give you my opinion about that, but I would share

4    that I think that that is coming on the heels of the

5    BOLI settlement and the other issues at the branch

6    addressed at the beginning of session.  I think it

7    is prudent to keep that in mind when evaluating the

8    situation.

9              While this is different, absolutely,

10   but those same sorts of thoughts and concerns, I

11   think, would be important to keep in mind here.  But

12   I don't know that I'm in a position sitting here

13   right at the moment to give an opinion one way or

14   the other whether or not it would run the risk of

15   violating that conciliation agreement, but I

16   certainly think the conciliation agreement is

17   important to keep in mind in this situation.

18              SENATOR MANNING:  Mr. Chair, is there

19   a way that we can get some kind of a -- how

20   (inaudible) or a legal opinion -- what the BOLI

21   report does is something similar to this.  Just

22   hypothetically speaking, what would it look like,

23   what our responsibilities would be?  Is that

24   practical?  Is that doable?  Or maybe it's something

25   I need to look at myself?

1          SENATOR PROZANSKI:  Senator Manning,

2     clearly you can make that request.  There is kind of

3     a unique situation here.  Based on what I remember

4     and -- I've taken from the BOLI settlement agreement

5     -- as to maybe some limitations on the legislative

6     counsel as to how they advise and interpret for the

7     branch in this specific area.

8          Ms. Bumgart is actually our special --

9     attorney who has -- who has been brought in to give

10    the independence from the legislative counsel, so

11    that request more than likely -- if we were moving

12    forward on that -- would be for me to turn to

13    Ms. Bumgart and say -- ask her to provide us with

14    that.

15          So that's, I think, the steps that

16    would need to be taken for that to occur.

17          SENATOR MANNING:  I'd really like to

18    hear that.

19          SENATOR PROZANSKI:  All right.

20          First, any other follow-up?  Senator

21    Olsen?

22          SENATOR OLSEN:  Thank you.  Thank you

23    once again for the latitude.

24          Ma'am, you're familiar with the Oregon

25    Constitution.  Correct?

1    MS. BUMGART: Yes.

2    SENATOR OLSEN: I would hope. You're

3    familiar with Article 4, Section 9?

4    MS. BUMGART: Mr. Chair, Senator

5    Olsen, I am generally familiar with our Oregon

6    Constitution. I'm generally familiar that there are

7    certainly rights that senators and other public

8    officials in this state have. I do not have that

9    provision in front of me at the moment.

10    SENATOR OLSEN: Which is fine. I'll

11    just get to the point.

12    It states in Article 4, Section 9 that

13    "Nor shall a member for words uttered in debate in

14    either house be questioned in any other place."

15    The statement that Senator Boquist

16    made was in debate in the chamber on the floor. So

17    my assumption to the Constitution, and relating to

18    it, that the second half of the -- of the concern,

19    the hell brought to President Courtney, would not be

20    allowed because it was in debate.

21    So I would think that we would only be

22    dealing with one issue, then, with the Oregon State

23    Police. Am I incorrect in that assumption?

24    MS. BUMGART: Mr. Chair, Senator

25    Olsen, I believe it is outside the scope of my

1  relationship with the branch and also my expertise

2  to give you Constitutional opinion as to whether or

3  not Senator Boquist's statement, either all of it or

4  a portion of it, was an exercise in free speech.  I

5  think that that is something for the -- I just think

6  that's outside the scope.

7          My concern and my recommendation was

8  we have threats of violence in the workplace.  We

9  have reports of employees feeling intimidated.  I

10  think ultimately if there is a finding

11  recommendation, that that would be part of the

12  process.  But there are certain types of speech and

13  threats of violence that do go outside of the First

14  Amendment protections.

15          So I'm not here in any capacity to

16  render an opinion one way or the other on that.

17          SENATOR PROZANSKI:  Follow-up?

18          SENATOR OLSEN:  Yes.  Thank you very

19  much.  I appreciate your -- I appreciate your

20  comment on that.  But on the floor we sometimes get

21  heated.

22          I was chastised because I used the

23  word "hypocrisy," and I thought it was a very

24  legitimate term to use, but I was chastised for the

25  fact that it, perhaps, could impugn my colleagues

1    and I would never want to do that because we all

2    take this job very seriously.  We try do the best we

3    can.  And one person's opinion shouldn't outweigh

4    another person's opinion, so we try to avoid getting

5    into those conflicts.

6         But in the fact that -- it is a fact

7    that in the Constitution it says, "Those words

8    uttered in debate," and it's exactly what we were

9    doing, we were debating issues, we were talking, one

10   could lay on a definition of "hell brought down on

11   you." Whether that rises to the occasion of a

12   threat, I find it difficult to believe.  But once

13   again, it's uttered in debate.

14        We've argued many times -- I've been

15   here eight years, and Senator Prozanski and I have

16   gone around and around many times on different

17   issues.  But the fact is that since this was

18   sincerely directed at the President, the other 29 of

19   us -- or at that time 28 of us -- did not receive

20   that wrath.  It wasn't directed at us.

21        And the senator certainly did

22   apologize in the debate -- and I repeat, in the

23   debate -- that was taking place on the floor.  So my

24   conclusion would be that since it was on the floor

25   and we were in debate, that this particular report,

1   or non-reports as the President did not report, be

2   removed from this action.

3                   And then when one speaks to the second

4   action on the OSP, it was made in this building, but

5   it was directed that if they came to his home in The

6   Dalles.

7                   So my question is how does that relate

8   back to this building, then, other than the fact

9   that he was a senator and stated it in this

10  building?

11                  MS. BUMGART:  Mr. Chair, Senator

12  Olsen, again, I'm not here to opine on the

13  Constitutional analysis, but I would not look at it

14  that narrowly.

15                  When we're talking about threats in

16  the workplace or conduct that maybe intimidating to

17  employees, I think we need to look more broadly

18  versus just, you know, the statement was directed to

19  President Courtney, for example.

20                  There are employees who sit up with

21  President Courtney.  There are employees who walk in

22  and out of the chamber.  There are other senators

23  present.  The reports that I received, which I found

24  to be credible, are if he's willing to threaten the

25  president of the Senate, if he's willing to threaten

1  the Oregon State Police, what will stop him from

2  harming anyone?

3              SENATOR OLSEN:  Mr. Chair, I object to

4  that.

5              SENATOR PROZANSKI:  Hang on one

6  second.  Everyone that's here, you're here to be

7  observing.  If you have comments that you want to

8  make, you need to leave the room.  One thing I will

9  not tolerate is having individuals make comments

10  from the gallery while we're ongoing with this

11  investigation.

12              We're glad that you're here, but

13  please respect our rules.  Thank you.

14              Senator Olsen?

15              SENATOR OLSEN:  Mr. Chair, I object to

16  that statement because it's -- it's an assertion

17  predicated on your own -- what's the term I want to

18  use -- on your own decision that you made it's a

19  credible threat.  Now you're passing on this

20  assertion that he could possibly do something else

21  in the workplace, and that's not right.  Because

22  this is not a court of law, and what you're saying

23  is your own opinion, and it's hearsay.

24              SENATOR PROZANSKI:  All right.  So

25  this isn't a court of law, and we shouldn't be

1    treating the witness as --

2                    SENATOR OLSEN:  I appreciate that.

3    But she can't be making statements on the record

4    like that.

5                    SENATOR PROZANSKI:  She can.  That's

6    her statement, that's her position as to her --

7    being our counsel, and you can accept it or not

8    accept it, but that is what she's here to tell us.

9                    SENATOR OLSEN:  Then I challenge that

10   statement because it's an assumption she's making.

11                   SENATOR PROZANSKI:  That's fine.

12                   All right, let me just follow up on a

13   couple of things.

14                   First of all, regarding the -- the

15   addressing of the President, our rules do, in fact,

16   require that an individual member not address an

17   individual member on the floor directly.  All

18   comments have to go through the podium through the

19   President.

20                   And so there has been situations and

21   individuals have said to me as to were those

22   statements really directed to the President

23   exclusively or did they also include other members?

24   So that's one of those things I think we all have to

25   take into consideration in the context -- I believe

```
 1  all of us were on the floor at the time -- as to
 2  what and how we would interpret that.
 3            Now, the other thing I want to, I
 4  guess, ask more of a broader perspective.  In your
 5  work as counsel for employment -- in the employment
 6  law area, do you believe that an elected official,
 7  because of their position, would have immunity
 8  through the First Amendment to be -- to make
 9  statements that would be perceived in other areas of
10  employment that could be considered intimidating,
11  threatening individuals in the workplace?
12            MS. BUMGART:  Chair Prozanski, I think
13  that's a very nuanced legal question, so a
14  Constitutional issue, and again, my opinion is not
15  -- on that I'm not here.  But I will say from an
16  employment perspective, looking at this stage, we
17  are at the beginning.  We are at this -- you know,
18  this is an A to Z investigation.  We are at the
19  outset; that it is -- that there needs to be a
20  balancing of interests and when the branch has the
21  knowledge that it has.
22            And all we're looking at is an interim
23  recommendation and steps to ensure the integrity of
24  the investigation, steps to ensure that the
25  workplace here at the capital is free from -- excuse
```

48

```
 1   me -- threats of intimidation.  That's how we're
 2   looking at it.  And I would think that that would
 3   warrant the same kind of evaluation, and in a way,
 4   and setting aside for a moment First Amendment
 5   immunity -- those Constitutional issues, which are
 6   very important -- if we're looking at this and
 7   comparing a senator to the CEO of an organization, a
 8   private organization, if these comments were made by
 9   a CEO, undeniably that CEO would be put out on leave
10   pending investigation, and if these proved true,
11   would be fired.
12            And I view -- I guess if we're looking at
13   the pecking order here at the capital -- that
14   certainly a senator -- a sitting senator -- an
15   elected public official in Oregon -- there are --
16   there's a heightened level of obligation.
17            Certainly in a regular employment setting,
18   supervisors, managers, and certainly executives of
19   the organization are held to a higher account
20   usually by the employer and law.  And I would view
21   that similarly here.
22            SENATOR PROZANSKI:  All right.  Other
23   questions?
24            SENATOR MANNING:  Just real quick.
25   Mr. Chair, thank you so much.  Ms. Bumgart, thank
```

1 | you so much.
2 | What I'm hearing from you is that
3 | based off the evidence -- well, let me take that
4 | back -- evidence.
5 | Based off the findings from the
6 | information, that's the only thing that I have been
7 | receiving from you that you have interpreted as
8 | potential violation of Rule 27.
9 | Now, when we -- we talk about on the
10 | floor, you know, things that we see on the floor,
11 | that it's uninhibited -- things like that -- I would
12 | say that it depends on who is saying it.
13 | Because there was a case where I made
14 | a statement on the floor, and later on a colleague
15 | read it back from a news article.  So I don't think
16 | that that is a proper use of that.
17 | If you -- if you can't do it for all,
18 | then you shouldn't claim it for any.  So I want to
19 | just make sure that we were -- that I got that out
20 | there.  This is not a court of law.  It's -- we're
21 | looking at hearing an inquiry.
22 | Your report back thus far, I want to
23 | commend you for the work that you have done.  And I
24 | know that we have a long ways to go, so I just want
25 | to put that out on the record because it seemed to

1    be, at times, things that are being directed at you

2    that's kind of trying to mischaracterize what you're

3    saying.

4              There's a term for that called

5    gaslighting.  So I want you to stay focused and

6    continue on unbiased and just go where the evidence

7    leads us to.  Thank you.

8              SENATOR PROZANSKI:  Senator Olsen?

9              SENATOR OLSEN:  Yeah.  Thank you.  One

10   more question, please.

11             If, hypothetically, Senator Boquist

12   and Senator Courtney were at Magoo's having a beer.

13   And --

14             SENATOR PROZANSKI:  Local watering

15   hole.

16             MS. BUMGART:  I went to Willamette

17   undergrad and law school, so I'm aware of Magoo's.

18   I've been there many times.

19             SENATOR OLSEN:  Yeah.  There we go.

20   It just popped into my head.

21             Say they were having a beer together,

22   and Senator Boquist looks at Senator Courtney and

23   says, "If you do that, hell is going to come down on

24   you."  Would that be a workplace violation

25   considering the fact that the bar is always filled

1     and other people would have heard it?

2                    MS. BUMGART:  Yeah.  Chair Prozanski,

3     Senator Olsen, it depends.  I would not liken that

4     situation to what happened here.  And if two

5     colleagues are out having a beer and having words, I

6     think that we would be unlikely finding ourselves

7     having this conversation, but that's not what

8     occurred.

9                    SENATOR OLSEN:  Follow-up then.

10                    If -- if Senator Boquist had published

11    that or Tweeted that out, that "Hell would come down

12    on you," would that make it different?  Would that

13    make it a workplace violation?

14                    MS. BUMGART:  Mr. Chair, Senator

15    Olsen, so the same statement Tweeted versus made on

16    the Senate floor?

17                    SENATOR OLSEN:  Yes.  Yes.

18                    MS. BUMGART:  I think I would have the

19    same concern to the extent it reached -- the mode of

20    communication is not necessarily dispositive.

21    Right?  I mean, the threats can come via email.

22    They can be through social media, as we often see

23    these days quite commonly, or they can be

24    face-to-face.

25                    SENATOR OLSEN:  Thank you.

```
 1                    SENATOR PROZANSKI:  Senator Knopp?
 2                    SENATOR KNOPP:  Thank you, Brenda.
 3      You stated earlier that you did not receive reports
 4      from the Senate president or from the Oregon State
 5      Police.  Did you interview the Senate president or
 6      the Oregon State Police in your -- in issuing your
 7      report?
 8                    MS. BUMGART:  Chair Prozanski, Senator
 9      Knopp, no, I did not interview either the Oregon
10      State Police or President Courtney.
11                    SENATOR KNOPP:  Okay.  Thank you.
12                    SENATOR PROZANSKI:  So, Brenda, my
13      understanding is that what you base this on is on
14      basically what some people would say on the face of
15      the document -- or the statements themselves that
16      were recorded on video that you reviewed.  And you
17      solely and exclusively came to us in your capacity
18      as our legal counsel for employment situations and
19      ensuring that we were aware that these two
20      statements that were made, one on the floor and one
21      outside of the chamber within a couple of hours,
22      caused you concerns for the potential risk to the --
23      to the branch on the liability issue as well as the
24      safety of those who are working within the building,
25      some who brought reports to you, others who may not
```

1    have?

2              MS. BUMGART:  Chair Prozanski, that is

3    a correct summary.

4              SENATOR PROZANSKI:  All right.

5              SENATOR OLSEN:  Can I ask a question,

6    Mr. Chair?

7              SENATOR PROZANSKI:  Yes.

8              SENATOR OLSEN:  I've got another one.

9              SENATOR PROZANSKI:  Another last one?

10             SENATOR OLSEN:  Yeah, another last

11   one.

12             SENATOR PROZANSKI:  Okay.

13             SENATOR OLSEN:  Because you've talked

14   about in your -- in your statement -- in your

15   memorandum you said that have caused members and

16   branch employees to report concerns, are those

17   reports reported to superiors or were they directed

18   to you, or were they written and documented, or were

19   they undocumented and just verbally passed along?

20             MS. BUMGART:  Chair Prozanski, Senator

21   Olsen, it was a combination, except I did not

22   receive any reports to me directly at the time

23   between June 19th, when the statements were made,

24   and the usual issuance of my memorandum.  They were

25   some oral reports, some email reports, some by

1    appointing authorities.  My understanding is staff

2    had come to them, so they were fulfilling their

3    obligation what they saw, under Rule 27, to pass it

4    along.  And then some were directly from -- from

5    staff or other members expressing their own

6    individual concerns.

7            SENATOR OLSEN:  Follow-up for

8    clarification.  They were not directed to you?  They

9    were given to other people and then they verbally

10   communicated them to you.  Is that correct?

11           MS. BUMGART:  Chair Prozanski, Senator

12   Olsen, it is correct that no reports were sent

13   directly to me.  They were either communicated

14   orally or passed on via email.

15           SENATOR MANNING:  Just one final one.

16           SENATOR PROZANSKI:  Senator Manning?

17           SENATOR MANNING:  Mr. Chair, I noticed

18   that when there was talk of this committee getting

19   together, you and I spoke one-on-one briefly

20   (inaudible) there was a chance that this committee

21   will come about.  I've not spoken with anyone else

22   since that point in time since we spoke.

23           I know -- well, I think I'm aware that

24   you may have spoken to each one of us individually

25   about what the committee is going to be pulled for,

1    what it's going to be designed for.  My question is

2    that how many, if any, have had this conversation

3    prior to the committee meeting with Senator Boquist?

4              SENATOR PROZANSKI:  Are you asking of

5    the members that are here who have had contact with

6    him?

7              SENATOR MANNING:  Yes, and talked

8    about this committee.

9              SENATOR PROZANSKI:  Yeah.  As I stated

10   on the record at the beginning, Senator Boquist, I

11   believe we had two conversations that were direct.

12   One was on the 30th of June, at which point I wanted

13   to ensure that he had the notice of the posting of

14   the hearing as well as the two documents that went

15   out, which was the Confidential Memorandum that

16   we've referred to today, as well as a cover letter

17   -- or I should say cover email that's dated the same

18   date, June 25th, that came out in the legislative

19   administration and -- at that point.

20              And then since then, I believe Senator

21   Boquist and I have had one other telephone

22   conversation.  I forget the date.  I don't have that

23   in front of me.  And then there has been some

24   correspondence by email.

25              What I wanted to ensure, as I stated

```
 1    at the beginning, that this is not a conduct, formal

 2    or informal -- not that we'd have the informal in

 3    front of us -- complaint, but was a report.  And

 4    that's where I wanted to correct the record because

 5    when I was in his office on the 30th, I

 6    unfortunately used the term "complaint," and I

 7    should have technically been using the term

 8    "report."

 9             And so there has been some

10    communication between myself and Senator Boquist by

11    email clarifying some different perspectives that

12    each of us shared with each other.  That's all that

13    I've had.

14             So I'm not sure if the other members

15    want to comment.  I will also say Senator Knopp and

16    I spoke once together on the floor.  I believe it

17    was on the 30th prior to me speaking with Senator

18    Boquist.

19             And Senator Olsen and I have not had

20    any direct conversation regarding this topic since

21    his appointment by the president.

22             SENATOR MANNING:  And just to follow

23    up.  Just listening to the types of questions that

24    have been presented, I would really be interested to

25    understand if the rest of the committee has had
```

1   direct conversation with Senator Boquist regarding

2   this prior to this meeting today?

3               SENATOR OLSEN:  Absolutely not.  I

4   have not talked to him.  I've gotten all my

5   information off of OLIS.  It's right here in front

6   of me.  All the -- all the referrals, anything that

7   I have, is off of OLIS.  And I have not talked to

8   him.

9               SENATOR KNOPP:  Yeah.  Mr. Chair,

10  Senator Manning, I have not had any contact with

11  Senator Boquist.

12              SENATOR PROZANSKI:  All right.  All

13  right.  If there's no other questions for the -- for

14  counsel --

15              MS. BUMGART:  Chair Prozanski, may I

16  just clarify one point --

17              SENATOR PROZANSKI:  Please.

18              MS. BUMGART:  -- because I don't want

19  there to be any misstatement or inference.

20              To the earlier question by Senator

21  Olsen about the scope that caused some comments from

22  the gallery, I was not issuing my opinion in any

23  way, shape, or form as to what -- I have no opinion

24  as to what Senator Boquist -- whether he would act

25  upon these or not.  God, we hope not.

1          My point was what employees had

2    reported.  So I don't want there to be any confusion

3    when I mentioned that employees had reported

4    concern, that if these statements were made by him

5    in public to the Senate President and to the Oregon

6    State Police, the concern was for their own safety,

7    if he would make those statements.  That was my

8    point.

9          And I just want to make sure that the

10   record is clear that I'm not rendering any opinion

11   as to whether those employee fears are valid or not.

12   I'm just purely stating those are some of the facts

13   I have for consideration.  When I mentioned there

14   are employee reports, those were some of the reports

15   I was receiving.

16          SENATOR PROZANSKI:  So let me just

17   follow up on that.  I mean, I think that the thing

18   that's difficult for many individuals is that we're

19   having a mix of different types of law and

20   perspectives and expectations in the employment area

21   which is, again, new to me, I think new to many of

22   us, as to what our obligations and requirements are.

23          There are overlays as to the need for

24   bringing forward, as you did as counsel, to the

25   employer, which would be us, the risk that we have

1    by not taking action based on individuals who are

2    within that workplace that could be subject to these

3    type of fears, concerns, and potential acts.

4                    SENATOR OLSEN:  Mr. Chair?

5                    SENATOR PROZANSKI:  Yes.

6                    SENATOR OLSEN:  I am not a lawyer.

7    Make it clear.  I do watch Perry Mason.  He's cool.

8    I like him.  I'm not a lawyer.  But the comment that

9    the attorney just made "God, I hope not," if this

10   was a court of law, I would have objected, objected,

11   because you were implying bias by putting that in

12   there.  And I would have objected to the Court and

13   let the judge be the decision, but this is not a

14   court of law.

15                    But I just would hope that -- that you

16   eliminate -- I mean, you're supposed to be a neutral

17   arbiter.  I would hope you would eliminate all of

18   that and go down the line like you're supposed to

19   and find what's true and what's not true.

20                    I find it discerning that you don't

21   have the number of reports or any reports whatsoever

22   to tell us about other than the fact that someone

23   said that they are concerned.

24                    SENATOR PROZANSKI:  Senator Olsen, I

25   think, again, we're -- we're starting to mix stuff

1    again --

2                    SENATOR OLSEN:  Yeah.

3                    SENATOR PROZANSKI:  I mean, the bottom

4    line is what's happening on the complaints

5    themselves, if they are going to come forward, will

6    be judged on those days at the time we get them.  To

7    try to bring in and bootstrap in stuff that's being

8    under an investigation into what I call an interim

9    step based on the attorney saying we are at risk if

10   we do not take action based on these two threats

11   that were made in those -- in the venues that they

12   were made --

13                   SENATOR OLSEN:  I agree.  So what is

14   our goal?  What is the goal of this committee today?

15                   SENATOR PROZANSKI:  The goal is --

16                   SENATOR OLSEN:  You say we're going to

17   do a work session, but what are we going to work on?

18                   SENATOR PROZANSKI:  The goal is to

19   determine what, if any, other steps do we have as --

20   I mean, I say we, as a committee, to the legislative

21   branch, to actually take action to ensure the safety

22   of individuals within the workplace while the

23   investigation on the potential complaints are going

24   forward.

25                   In other words, we -- based on what

61

1    she has given to us, the statements that were --

2    that are not in doubt because they are videotaped,

3    put out a concern to -- as we heard -- sorry, I

4    didn't write that term down -- I want to say the

5    managers, individuals such as members, staff for the

6    members, the legislative branch employees who work

7    within this workplace, meaning the state capital --

8    as to whether we should be looking at any type of

9    steps to ensure the workplace is free of those

10   concerns during the period of the investigation and

11   whether there is a need at this point -- and I think

12   it's very fair to say we now have a number of days

13   that have passed since those statements were made on

14   the 19th of June.

15            And so those are the factors that we

16   need to take into consideration.  Clearly, counsel

17   has told us it doesn't matter, per se, when they

18   were said, but in the context of what was there and

19   what steps have or haven't been taken.  And that's

20   part of the stuff that we'll be talking about.

21            SENATOR OLSEN:  Well, Mr. Chair, for

22   clarity, I believe counsel has mentioned the

23   concerns from employees and reports, but we don't

24   see the reports, so I'm concerned that where are

25   they?  Where we're taking actions against someone

```
 1    without physical documents stating that "I feel
 2    concerned about this and I made that report to my
 3    superior and my superior has since passed that on to
 4    you," that report should be available to us to see
 5    what exactly their concern was.
 6                  MS. BUMGART:  Mr. Chair, may I just
 7    say briefly --
 8                  SENATOR PROZANSKI:  Yes.
 9                  MS. BUMGART:  -- so my -- and I think
10    I said this earlier, but if not, I really want to
11    underscore.  My recommendation would be the same
12    whether I had a physical email in my hand or not,
13    whether it was 2 employees or 15 employees.
14                  My recommendation is based on public
15    statements that were made and the risk that the
16    branch has if it -- if it doesn't address those.
17    That's it.
18                  I understand there is -- I understand
19    where you're coming from as far as wanting to know
20    more information about the reports and that.  Well,
21    that is why we have the investigatory process.  But
22    my recommendation would be absolutely the same even
23    if no employee came forward with a formal or
24    informal report.
25                  SENATOR PROZANSKI:  Yeah, my
```

1    understanding, and what I would take away from this

2    is, your interim memorandum to us is based on,

3    again, public statements that were made that are not

4    in dispute, and it's the context of what was said in

5    the context of ensuring a workplace that's free of

6    threats of violence, intimidation, or retaliation.

7                    MS. BUMGART:  That is correct, Chair

8    Prozanski.

9                    SENATOR PROZANSKI:  All right.  Any

10   other comments?

11                   Thank you very much.  I assume that

12   you'll be here if the committee chooses to ask you

13   to come back up?

14                   MS. BUMGART:  Yes, I will remain.

15   Thank you very much.

16                   UNIDENTIFIED SPEAKER:  Thank you.

17                   MS. BUMGART:  Thank you.

18                   SENATOR PROZANSKI:  All right.  So

19   based on where we're at at this point and knowing

20   what the context of what our mission is at this

21   point as to determining what, if any, interim steps

22   we should be taking based on this confidential

23   memorandum report, again, regarding Senator Brian

24   Boquist, interim findings and recommendations dated

25   June 25th of this year, the Chair is going to give

```
 1    Senator Boquist the opportunity, if he'd like, to
 2    come forward to make any statements that he'd like
 3    to make to us as well as potentially answering any
 4    questions.
 5              SENATOR BOQUIST:   Thank you,
 6    Mr. Chair.   Senator Prozanski, senators, citizens
 7    present, first, let me thank the Oregon State
 8    troopers for their service and professionalism over
 9    the last two months.
10              Whether Kate Brown or Peter Courtney
11    issued troopers an illegal order will now be
12    determined in a court of law.
13              Second, let me thank the at-will staff
14    in the Oregon legislative assembly for their service
15    and professionalism in the face of employee abuse,
16    sexual harassment, retribution that they have faced
17    since last year, to a complete failure of the Senate
18    leadership.
19              Third, now to the alleged employment
20    or political hearing today.   Senator Prozanski was
21    kind enough last Sunday to visit me in my capital
22    office, handed me three pages of what he knew at the
23    time:   a draft agenda, a letter signed by
24    Ms. Bumgart of Stole Reeves -- one page of it.   He
25    did provide a second page later.   And that's a
```

65

1    photocopy problem.  It's not the good senator's.

2    Okay?  -- and a memo signed by Ms. Nieling that also

3    identified Mr. Johnson -- Dexter Johnson --

4    legislative counsel as well participating.  That is

5    about the total -- that is just about the total sum

6    of the due process or my knowledge of Senator

7    Courtney's intent to this proceeding and his task

8    into the good chair.  This formal public record

9    outlines these facts that will now be used again in

10   a court of law.

11               Fourth, last week my wife, staff, and

12   I issued formal complaints against the Oregon State

13   Senate with the appropriate federal civil

14   authorities.

15               Fifth, on Friday I filed a lawsuit in

16   the civil court against the Honorable Peter

17   Courtney, and many of those involved today are

18   listed in the lawsuit.  None of you gentlemen

19   except, my apologies, Mr. Chair, our conversation.

20               The civil court action will be amended

21   after this alleged hearing today, or whatever is

22   today.  Appropriate legal service has been executed.

23   I have asked the Oregon Department of Justice to

24   provide myself and the court the name of the

25   attorney who will represent the majority in the

1    Oregon State Senate, or will the attorney general

2    recuse themselves from defending Senator Courtney as

3    they have in past harassment complaints.

4                    All inquiries and questions regarding

5    this political or employment matter will be

6    submitted through your court-recognized lawyer from

7    this point forward.  We are now formally in a court

8    of law.

9                    Lastly, for the public record, for a

10   long time the Oregon State Police superintendent,

11   Marion County district attorney, other district

12   attorneys, federal authorities, and other legal

13   authorities, know full well I've offered full

14   cooperation in any legal probable cause law

15   enforcement action, any judge ordered action, and

16   any civil matter.

17                    I look forward to seeing this matter

18   in the court.  Thank you.  Gentlemen, have a good

19   day.

20                    SENATOR PROZANSKI:  All right.  Thank

21   you.

22                    I'm assuming, Senator Boquist, that

23   concludes your testimony and statement, and at this

24   point you do not want to entertain any questions

25   just for the record?

July 8, 2019

65

1          SENATOR BOQUIST:  I believe,

2   Mr. Chairman, you're an attorney and you have

3   counsel here, and you know how the court proceeding

4   works.  Thank you.  There will be no questions.

5          SENATOR PROZANSKI:  Thank you.

6          That will conclude the public hearing

7   portion of our hearing today, so I'm going to go

8   ahead and close the public hearing.  And at this

9   point -- so at this point we're going to recess the

10  committee.  It's about 10:12, and I'm going to say

11  why don't we break for about 30 minutes and that

12  we're in recess until 10:45.

13                  --o0o--

14

15

16

17

18

19

20

21

22

23

24

25

68

July 8, 2019

66

1    STATE OF OREGON    )

2                       )   ss.

3    County of Lane     )

4

5

6         I, Sara Fahey Wilson, CSR, a Certified

7    Shorthand Reporter for the State of Oregon, certify

8    that the transcript is a true record of the

9    transcription of the audio recording; that the

10   foregoing transcript consisting of 65 pages contains

11   a full, true, and correct transcript of said audio

12   recording so reported by me to the best of my

13   ability on said date.

14        IN WITNESS WHEREOF, I have set my hand

15   this 24th day of July 2019, in the City of Eugene,

16   County of Lane, State of Oregon.

17

18

19

20

21

22

23   Sara Fahey Wilson, CSR

24   CSR No. 06-0400

25   Expires:  March 31, 2020

69