IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BRIAN J. BOQUIST,

        Plaintiff,

    vs.

PETER COURTNEY, *Oregon State Senate President, in his individual and official capacities*, FLOYD PROZANSKI, *Senator, in his individual and official capacities as Chairman of the Senate Special Committee on Conduct*, JAMES MANNING, *Senator, in his individual and official capacities as member of the Senate Special Committee on Conduct*,

        Defendants.

_____

Case No.: 6:19-cv-01163-MC

OPINION AND ORDER

MCSHANE, J.:

> *"I understand the threats from members of the majority that you want to arrest me, you want to put me in jail with the state police, and all that sort of stuff . . . Mr. President, and if you send the state police to get me, Hell's coming to visit you personally."—Senator Brian Boquist on the Senate floor, June 19, 2019.*

> *"Send bachelors and come heavily armed. I'm not going to be a political prisoner in the state of Oregon. It's just that simple." – Senator Brian Boquist to reporters, June 19, 2019.*

Plaintiff Brian Boquist, an elected Oregon State Senator, was disciplined by a Senate conduct committee for speaking the above politically charged words. Specifically, he was required to provide 12-hour notice prior to arriving at his workplace in the Capitol building in order to assure the safety of others. Plaintiff claims that the action of the committee was

retaliatory and violated his First Amendment rights of free speech and association. He brings this

Section 1983 suit against Defendants Peter Courtney, Floyd Prozanski, and James Manning in

their individual and official capacities. Defendants respond that Plaintiff's words were not

protected speech and that the discipline was necessary to protect others from the threat posed by

Plaintiff. Both sides, wedded to the positions of their performative politics, now file cross-

motions for Summary Judgment. ECF Nos. 51, 59. The Court heard oral arguments on July 10,

2023. Because the 12-hour notice rule served no legitimate purpose other than to retaliate against

Plaintiff after he engaged in protected speech, Defendants' actions violated Plaintiff's First

Amendment rights to free speech and association. Defendants' Motion (ECF No. 59) is DENIED

and Plaintiff's Motion (ECF No. 51) is GRANTED.[1]

## BACKGROUND

In May of 2019, the Republican caucus of the Oregon State Senate participated in a

walkout to prevent a quorum. Pl.'s Mot. Summ. J. 6; Defs.' Mot. Summ. J. 3. Although no

disciplinary actions were taken, then-Senate President Peter Courtney threatened the absent

legislators with fines, potential arrest, imprisonment, and investigation. Pl.'s Mot. 6. On June 19,

2019, Plaintiff told President Courtney during a debate on the Senate floor, "I understand the

threats from members of the majority that you want to arrest me, you want to put me in jail with

the state police, and all that sort of stuff … Mr. President, and [sic] if you send the [S]tate

[P]olice to get me, Hell's coming to visit you personally." *Id*. at 7; Pl.'s Fourth Am. Compl. ¶ 7,

ECF No. 45. Following Plaintiff's statements, President Courtney, while appearing calm and

somewhat melancholy, stated, "I understand that people are very upset right now about a lot of

things. I would like the word decorum to be thought about often . . . I ask that you please

---

[1] The Court notes that protected speech is not necessarily meaningful or lofty speech.

remember that when we're talking." Jones Decl. Ex. 28, at 34:20–55, ECF No. 53. Following

President Courtney's remarks, Plaintiff immediately stood up and said to President Courtney, "I

apologize. To you personally." *Id.* at 34:58–35:03. President Courtney accepted the apology and

later responded, "I know it's very hard, it's just very hard, and I understand that." *Id.* at 35:28–

32. He then continued with the next order of business. *Id.* The assembly gave a collective

shoulder-shrug and moved on.

 In fact, according to President Courtney, not a single person stood up, objected, or visibly

reacted to Plaintiff's statements. Jones Decl. Ex. 23 at 9. No one requested the Oregon State

Police officer present on the Senate floor to take action, and no staff member reported to

President Courtney that they felt threatened or concerned for their safety.[2] *Id.* at 10. President

Courtney testified that he did not personally feel threatened by Plaintiff's statements on or after

June 19, 2019. *Id.* at 19.

 Later that day, a KWG news reporter interviewed Plaintiff inside the Oregon State

Capitol. Pl.'s Mot. 8; Defs.' Mot. 5. When asked about Governor Kate Brown's suggestion to

send the Oregon State Police to round up Republicans, Plaintiff stated the following:

> Okay. So sending the threat out, like, "Oh, we're going to have a special session, or
> I'm going to send the state police to arrest you." Well, I'm quotable, so here's the
> quote. This is what I told the [OSP] superintendent. "Send bachelors and come
> heavily armed. I'm not going to be a political prisoner in the state of Oregon. It's
> just that simple."

---

[2] Senator Olsen, who was on the floor at the time, testified that he did not feel threatened and "never heard
any senator, staff member, visitor, or Oregon State Trooper mention that they feel threatened or somehow
unsafe because of the comment by Senator Boquist." Olsen Decl. ¶¶ 5–6, ECF No. 57; *See also* Johnson
Decl. ¶ 7, ECF No. 55 (Senator Betsy Johnson testifying, "[t]he statements made by Senator Boquist on
June 19, 2019, did not cause me any concerns for my safety or for the safety of anyone else in the Capitol.
To me, they were hyperbolic statements").

Defs.' Mot. 6. The following day, Republican senators participated in a second walk out, returning to the Capitol on June 29, 2019. *Id*. at 8; Pl.'s Mot. 9. OSP troopers were never sent out to round up or arrest any Republican senators.[3] *Id*; Abrams Decl. Ex. 9, at 3, ECF No. 58.

In the days following the walkout, Plaintiff received warnings from several colleagues that Democratic party members were extremely upset and had plans to punish Plaintiff for his actions. *See* Johnson Decl. ¶ 14, ECF No. 55 (Senator Johnson recalls telling Plaintiff "that my caucus had their long knives out for him and wanted to punish him. I told [Plaintiff] to be careful because Fagan and others wanted to make an example out of him"); Knopp Decl. ¶ 19, ECF No. 56 ("I had seen plenty of emails and evidence that the Democratic base was angry at the majority for not passing their legislative agenda and they were calling for retribution. It was obvious that the Democrats were going to punish Senator Boquist for that purpose.").

In a Confidential Memorandum[4] delivered to the Oregon Legislature's HR director on June 25, 2019, independent counsel Brenda Baumgart opined that Plaintiff's statements "constitute credible threats of violence directed at the Senate President and the Oregon State Police" and recommended that Plaintiff be prohibited from entering the State Capitol building for the remainder of the investigation. Jones Decl. Ex. 12, at 1–2. Ms. Baumgart relied on reports "that people [were] fearful and scared to come to work" and averred that those "reports

---

[3] At oral argument, Defendants' counsel claimed that OSP troopers were sent out to locate the absent Republican senators. In their briefing, Defendants also state that Superintendent Hampton sent troopers to the homes of other Republican senators but did not send troopers to Plaintiff's home. Defs.' Resp. 8, ECF No. 64. The Court has scoured the record, including both excerpts from Mr. Hampton's depositions, and finds no evidence substantiating these claims. *See*, Abrams Decl. Ex, 9; Jones Decl. Ex. 30.

[4] Curiously, the *Confidential* Memorandum was made publicly available on the Oregon Legislative Information System, after a KGW reporter requested a copy of the document. Jones Decl. Ex. 34, at 12. Ms. Baumgart apparently asked HR Director, Jessica Knieling to remove "attorney client privilege" from the document. *Id*. at 11.

[were] credible," without providing the names of witnesses or any other evidence to substantiate her findings. *Id*. at 1.

On the same day that Ms. Baumgart made her recommendation, HR Director Jessica Knieling notified Defendants that under the current Legislative Branch Personnel Rule 27 ("Rule 27), only the "full senate" could adopt sanctions against Plaintiff by a two-thirds majority vote. Jones Decl. Ex. 6, at 6; Ex. 12, at 1 (Kneiling stating that "[t]he independent investigator, Legislative Counsel and Legislative Administration have no authority to implement the independent investigator's recommendations[.]").  On June 29, 2019, the Oregon Legislature adopted House Concurrent Resolution 20 ("HCR 20"), which amended Rule 27 and authorized members of the [Senate or House] Special Committee on Conduct ("Conduct Committee") to impose interim safety measures against the subject of a Rule 27 investigation. Jones Decl. Ex. 7, at 9–10.  Under the amendment, such interim safety measures were enforceable only until the completion of a formal investigation, or "84 days from the date [a] complaint is made." *Id*. at 9–10. Then, only after a full investigation, a formal hearing, and a determination that the subject violated Rule 27, could the Conduct Committee impose permanent remedial measures. *Id.* at 11–12. Notably, Rule 33 in HCR 20 provided that the amendments to Rule 27 were not *"operative"* until the Joint Committee on Conduct (1) appointed a Legislative Equity Officer ("LEO") and (2) notified the presiding officers.[5] *Id.* at 16. On November 25, 2019, "the Joint Committee on Conduct notified the presiding officers that Jackie Sandmeyer was appointed to serve as the acting Legislative Equity Officer," and the amendments to Rule 27 "became operational[.]" Jones Decl. Ex. 16, at 1. Accordingly, the amendment allowing the Senate Conduct Committee

---

[5] Until a LEO was appointed, only the Legislative Administrators and HR Director had authority to implement interim safety measures after June 29, 2019. Jones Decl. Ex. 7, at 16.

to impose interim safety measures against Plaintiff was not in effect until five months after Plaintiff made his statements. Simply put, the Senate Conduct Committee was not in a position to act until sometime in November of 2019.

Nevertheless, on July 8, 2019,[6] the Conduct Committee held a Rule 27 hearing regarding whether Plaintiff's actions "posed a threat of violence or intimidation" and whether to impose interim safety measures. [7] Defs.' Mot. 9. The Committee was made up of four voting members; Republican Senators Knopp and Olsen, and Democratic Senators Prozanski and Manning. Pl.'s Mot. 15–16. During the hearing, both Republican Senators voiced concerns that the Committee was "rushing to a judgment" without interviewing witnesses or substantiating Ms. Baumgart's report. Pl.'s First Amend. Compl. Ex. 3, at 31–33, ECF No. 6 ("FAC"). Senator Prozanski responded that "our task today is not to be looking at the actual substance or merits of any report that has been made . . ." *Id.* at 5. Despite each member agreeing that Plaintiff did not "pose a current threat,"[8] the Committee unanimously imposed a rule requiring Plaintiff to provide the Secretary of the Senate with 12-hours' notice before he entered the Capitol building. [9] Defs.'

---

[6] The hearing took place nearly three weeks after the events that occurred on June 19, 2019. At the time Plaintiff made his statements, President Courtney had the authority to call a Conduct Committee meeting at any time, with just one-hours' notice. Jones Decl. Ex. 25, at 7.

[7] Typically, the public agenda for a Rule 27 Conduct Committee hearing does not include the name of the person under investigation. Pl.'s Mot. 16. However, for the July 8, 2019, hearing, Senator Prozanski specifically requested to publicize Plaintiff's name. *Id*.; Jones Decl. Ex. 26, at 3. Senator Prozanksi later testified, "it was imperative based on the news coverage that had occurred as to this issue that everyone knew that the Oregon Senate took up the issue [.]" *Id*. Ex. 22, at 6.

[8] *See* FAC Ex. 3, at 34 (Senator Prozanski stating, "it also is my belief that because of the amount of time that has passed, the lack of other issues coming forward, knowing that Senator Boquist has been in the building multiple times since this incident back on June 19th, that I do not believe that he poses a current threat as he did back on the 19th of June based when the statements were made.").

[9] According to Plaintiff, President Courtney presided over the hearing as an *ex-officio* member, which allowed him to cast a tie-breaking vote. Pl.'s Mot. at 16. Senators Olsen and Knopp later testified that they only voted for the 12-hour rule as a compromise to prevent President Courtney from using his tie-

Mot. 10; FAC Ex. 3, at 30, 34. The members also agreed that they would "increase[e] the presence of OSP troopers" when Plaintiff was in the building, however, this measure was never actually enforced. FAC Ex. 3, at 49; Pl.'s Mot. 21.

For several weeks, Plaintiff complied with the 12-hour rule by emailing Senate Secretary, Lori Brocker when he planned to be in the Capitol. Abrams Decl. Ex. 2, at 35–36. Then on September 27, 2019, Plaintiff sent a final email, stating "I will be in every day until my term if [sic] office expires in January 2021 in performance of my constitutional duties." Abrams Decl. Ex. 2, at 60. Plaintiff stopped providing notice altogether after he was reelected for office. Defs.' Mot. 18.

At no point since the 12-hour rule was imposed, has Plaintiff been prevented from entering the building or speaking on the senate floor; nor has he been sanctioned for failing to provide notice of his presence in the building. *Id.*; Abrams Decl. Ex. 2, at 36–38. Indeed, Ms. Brocker testified that she was never instructed to increase the OSP presence in the Capitol when Plaintiff arrived for work each day. Jones Decl. Ex. 29, at 6. OSP Superintendent, Travis Hampton also testified that he did not increase the presence of OSP troopers when Plaintiff was in the building; he was never even notified when Plaintiff did or did not comply with the notice requirement. Jones Decl. Ex. 30, at 10. Although the 12-hour notice rule was implemented as a temporary safety measure pending a formal investigation, no complaint was filed against Plaintiff and no Senate or OSP investigation ever took place. Pl.'s Mot. 23; Jones Decl. Ex. 30, at 9 (Superintendent Hampton testifying that he was unaware of any threat assessment or investigation into Plaintiff after the events on June 19, 2019); Jones Decl. Ex. 33, at 8 (Ms.

---

breaking vote to impose a harsher punishment, such as banning Plaintiff from the Capitol. Olsen Decl. ¶ 20, ECF No. 57; Knopp Decl. ¶¶ 23–24, ECF No. 56.

Baumgart testifying "the investigation did not move forward because a complainant would not sign his or her name or their name publicly."). Defendants formally rescinded the rule on November 28, 2022, after more than three years of litigation. Defs.' Mot. 10.  This entire process appears to be publicity stunt by a committee with no authorization seeking to impose a sanction against a member that it never intended to enforce.

## STANDARD OF REVIEW

"Federal Rule of Civil Procedure 56(a) expressly permits a party to move for summary judgment on a claim or defense." *E.E.O.C. v. Fred Meyer Stores Inc.*, 954 F. Supp. 2d 1104, 1112 (D. Or. 2013) (internal quotations and emphasis in original omitted). This Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could find in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.*

The Court reviews evidence and draws inferences in the light most favorable to the nonmoving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). When the moving party has met its burden, the nonmoving party must present "specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient" to avoid summary judgment. *Liberty Lobby, Inc.*, 477 U.S. at 252. Uncorroborated allegations and "self-serving testimony" are also insufficient. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).

**DISCUSSION**

I.    **First Amendment Retaliation**

The First Amendment provides that "Congress shall make no law . . .  abridging the freedom of speech . . . or the right of the people to peacefully assemble[.]" U.S. Cont. amend. I. Accordingly, government officials are prohibited from "subject[ing] individuals to retaliatory actions after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022). The Supreme Court has adopted a burden-shifting framework for elected officials bringing First Amendment Retaliation claims under 42 U.S. § 1983. *Boquist v. Courtney*, 32 F.4th 764, 777 (9th Cir. 2022). First, the elected official must establish that "(1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Id.* at 775 (quoting *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010)). Next, "the burden shifts to the defendant official to demonstrate that even without impetus to retaliate he would have taken the action complained of [.]" *Hartman v. Moore*, 547 U.S. 250, 260 (2006). "If there is a finding that retaliation was not the but-for cause of the discharge, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind." *Id*.

A.    **Protected Speech**

Defendants contend that Plaintiff was not engaged in protected speech or activity; instead, his statements were akin to fighting words or threats of violence, which are not protected under the First Amendment. Defs.' Mot. 11–15.

1. **Fighting Words**

Fighting words are "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky v. State of N.H.*, 315 U.S. 568, 572 (1942). To show that an actor used fighting words, one "must prove that there existed a likelihood that the person addressed would make an immediate violent response." *United States v. Poocha*, 259 F.3d 1077, 1080–81 (9th Cir. 2001). Moreover, fighting words typically require direct and personal insults. *Cohen* v. *California*, 403 U.S. 15, 20 (1971); *Chaplinsky*, 315 U.S. at 572 (calling someone a "God damned racketeer" and a "a damned Fascist" was unprotected speech because it would cause an average person to retaliate).

Plaintiff's statement to President Courtney that "Hell's coming to visit you personally" falls short of fighting words. Jones Decl. Ex. 28. President Courtney reacted with little emotion, and he gave no indication that he was personally offended or inclined to physically retaliate against Plaintiff. Instead, President Courtney calmly reminded Plaintiff of Senate decorum, Plaintiff apologized, and the Senate moved to the next topic of debate. Although Plaintiff's comment was bold and perhaps unsavory, it does not resemble the type of egregious insult that would provoke an "immediate violent response." *Poocha*, 259 F.3d at 1080-81.

Similarly, Plaintiff's statement to a reporter that he told Superintendent Hampton to "[s]end bachelors and come heavily armed" does not amount to fighting words. Jones Decl. Ex. 23, at 15–16. Unlike the face-to-face insult in *Chaplinsky,* Plaintiff's statement was directed towards individuals not even present at the scene, and no reasonable reporter who witnessed Plaintiff's comment would engage in an immediate violent response. 315 U.S. at 572; *Poocha*, 259 F.3d at 1080–81. Although some viewers may have found Plaintiff's political puffery distasteful, his comments were in line with our nation's "commitment to the principle that debate

on public issues shall be uninhibited . . . [and] may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Poocha*, 259 F.3d at 1081 (quoting *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 273 (1964)).

### 2.   True Threats

Defendants also argue that Plaintiff's statements were true threats. Defs.' Mot. 13–15. True threats are those "where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). Under the Ninth Circuit's objective test,[10] courts must determine "whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 746 (9th Cir. 2021). Critically, this Court must examine Plaintiff's statements by their "entire factual context, including the surrounding events and reaction of the listeners." *Corales v. Bennett*, 567 F.3d 554, 563–64 (9th Cir. 2009); *Watts v. United States*, 394 U.S. 705, 708 (1969). "[A] statement that appears to threaten violence may not be a true threat if the context indicates that it only expressed political opposition or was emotionally charged rhetoric. *Kazal*, 13 F.4th at 746; *Watts*, 394 U.S. at 708. In *Watts*, the plaintiff, while expressing his views about the draft at a political rally, stated to the crowd, "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Id.* at 706. Although the plaintiff's rhetoric arguably contained an implicit

---

[10] Defendants point to a recent Supreme Court decision that articulates a subjective standard of recklessness for criminal prosecutions of true threats. *See Counterman v. Colorado,* 600 U.S. ___, 1 (2023) ("The State must show that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence."). However, because there is no criminal statute at issue here, I do not find this case applicable. The requisite *mens rea* a state must prove before punishing a defendant's unprotected speech is irrelevant to the issues before this Court.

threat of violence against President Johnson, the Supreme Court construed the statement as

political hyperbole because (1) it was expressly conditional on an event that had not occurred, (2)

it took place during a political debate, and (3) the listeners reacted with laughter. *Id.* at 707–708.

Here, Plaintiff's comments were similarly hyperbolic, conditional — upon him actually

being arrested — and said in a highly charged political environment. With a second walkout

looming, Plaintiff had the goal in mind to "garner support" and ensure that his fellow party

members joined the next walkout. Jones Decl. Ex. 27, at 16; Olsen Decl. ¶ 10, ECF No. 57.

Plaintiff testified that he never believed that OSP troopers were coming to arrest him, or that

viewers would take his statements seriously. [11] Jones Decl. Ex. 27, at 17–18. And although

Plaintiff's statements were not met with laughter, the general reaction of listeners does not

indicate that Plaintiff intended to convey "a serious expression of intent to harm or assault"

President Courtney or OSP troopers. *Kazal*, 13 F.4th at 746. On the senate floor, no one reacted

to Plaintiff's statements, Senator Courtney did not press the panic button under his desk, and

OSP did not take any action against Plaintiff. Jones Decl. Ex. 28; Ex. 23, at 11. Senator Courtney

later testified that he never felt threatened by Plaintiff, and the Conduct Committee did not hold a

hearing until almost three weeks after the incident. Jones Decl. Ex. 23, at 19; Ex. 27, at 19–20.

Following Plaintiff's statements to reporters, Superintendent Hampton testified that it was

"within [Plaintiff's] right" to make the statements and Senator Knopp said he knew Plaintiff's

statements were only "political rhetoric." Knopp Decl. ¶ 13; Jones Decl. Ex. 30, at. 7. Even after

the 12-hour rule was implemented, Capitol staff never increased OSP security in anticipation of

---

[11] Jones Decl. Ex. 27, at 17–18 (Q: Okay. It never occurred to you even for a moment that when you say "send bachelors and come heavily armed" that others would receive that as you implying the Oregon State Police would need significant force to take you? A. No. I didn't believe the Oregon State Police were going to take me or take any other member.").

Plaintiff's arrival to the Capitol building. Jones Decl. Ex. 29, at 6–7; Ex. 30, at 10; Knopp Decl. ¶ 26–28.

There is some evidence, however, to suggest that a small group of staff members were concerned by Plaintiff's comments. Senator Fagan believed that Plaintiff's threats were serious and refused to bring her son to the Capitol after June 19, 2019.[12] Abrams Decl. Ex. 7, at 6–9, 13. Defendant Prozanski perceived Plaintiff's statements on the senate floor as a threat to "bring violence upon [Senator Courtney]," and Superintendent Hampton exhibited some reluctance to send officers to Plaintiff's home.[13] Abrams Decl. Ex. 13, at 4; Ex. 9, at 3. Senator Gelser and Senator Brocker stated that members of their staff expressed concern over Plaintiff's statements, and HR Director Knieling testified that employees expressed a genuine fear of Plaintiff. Abrams Decl. Ex. 8, at 11–12; Ex. 4, at 13; Ex. 10, at 8. While this Court does not seek to minimize the real fear that certain members of staff may have felt, in the wider context, the negative reactions of a small number of partisan listeners pales in light of the general consensus that Plaintiff's statements were political hyperbole. Moreover, the lack of serious and immediate action taken by

---

[12] Senator Fagan's fears stem from Plaintiff's military background. Abrams Decl. Ex. 7, at 8. ("Q. [W]hat was your rational basis for feeling threatened, personally threatened by Senator Boquist? A. The reputation that Senator Boquist has of being a kind of military ops background . . ."). Defendants run with this cheap line of reasoning, arguing that Plaintiff's service in the special forces and the fact that "he has possibly killed people" "confirms the reality" of Plaintiff's threats. Defs.' Mot. 14. Yet, Defendants offer no evidence whatsoever that Plaintiff has a history of violence. To the contrary, Senator Knopp testified, "Senator Boquist has never demonstrated any tendency towards violence that I have seen. I have never been concerned or fearful that [he] would ever take a violent act against anyone at the state Capitol[.]" Knopp Decl. ¶¶ 5–7. The Court will not entertain Defendants' prejudiced contention that Plaintiff's veteran status makes him more likely to carry out a violent attack. It is insulting to veterans. If members were truly worried of a shooting, statistically they should bar teenagers from the Senate, not veterans.

[13] Superintendent Hampton stated that sending officers to Plaintiff's home "would not have been a prudent move." Abrams. Decl. Ex. 9, at 3. However, as stated *supra*, n.2, there is no evidence that officers were sent to any Republican senator's home, and at no point did Governor Brown authorize any senate Republican's arrest. *Id.*

OSP and the Capitol staff tends to negate Defendants' argument these few allegations of concern were taken seriously.

Given the indifferent reaction of the majority of listeners, the wider political context, and the hypothetical nature of Plaintiff's comments, these statements do not constitute a true threat. While "the language of the political arena . . . is often vituperative, abusive, and inexact," political hyperbole should be tolerated given our national commitment to uninhibited debate on public issues. *Watts*, 394 U.S. at 708.

### B. Material Adverse Action

While there is no doubt that Plaintiff engaged in protected speech, he must next show that "he was subjected to a *materially* adverse action" that would "chill a person of ordinary firmness from continuing to engage in the protected activity." *Boquist*, 32 F.4th at 775 (emphasis added) (internal quotations omitted). An adverse action is material "when it prevents the elected official from doing his job, deprives him of authority he enjoyed by virtue of his popular election, or otherwise prevents him from enjoying the full range of rights and prerogatives that came with having been publicly elected[.]" *Id*. at 777 (cleaned up).

Here, nearly three weeks after Plaintiff's statements, and without conducting a proper investigation, Defendants imposed a rule requiring Plaintiff to provide the Secretary of the Senate with 12 hours' notice before entering the State Capitol each day. This Court adopts the Ninth Circuit's view that the 12-hour rule is a materially adverse action.[14] *Boquist*, 32 F.4th at 783 ("contemporary doctrine confirms that the 12-hour rule is a materially adverse action.") (cleaned up). The court found that the rule, on its face, is a "form of punishment" that

---

[14] In *Boquist v. Courtney*, 32 F.4th 764 (9th Cir. 2022), the Ninth Circuit reviewed the factual allegations in this case at the motion to dismiss phase and remanded the case back to this Court for further proceedings.

"eliminates the possibility of spontaneous speech" with Plaintiff's constituents. *Id.* (citing

*Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 163 (1969) (Harlan, J., concurring)

("[T]iming is of the essence in politics ... [and] it is often necessary to have one's voice heard

promptly, if it is to be considered at all.")).

> The 12-hour notice rule therefore prevents Boquist from exercising "authority he
> enjoyed by virtue of his popular election," namely, having timely access to the
> physical seat of government where "governmental debates" take place[.] The rule
> likewise interferes with Boquist's ability to meet with constituents, elected officials,
> and others at the State Capitol Building on short notice, and therefore "prevent[s]
> [Boquist] from doing his job. These significant burdens would "chill a person of
> ordinary firmness from continuing to engage in the protected activity.

*Id.* at 783–84.

Indeed, Plaintiff testified that after the rule was imposed, he began meeting with

constituents in a coffee shop, because "[c]onstituents generally very quickly wanted to meet."

Jones Decl. Ex. 27, at 21. He also stated that the notice requirement made certain constituents

uneasy because "they didn't want everybody to know they were coming to the Capitol to meet,"

so Plaintiff met with constituents outside the Capitol "to make them feel more comfortable." *Id*.

In sum, the 12-hour rule materially affected Plaintiff's right to free, unfettered access to meet

with constituents on short notice at the Capitol building; a right guaranteed by his status an

elected official.

### C.  Substantial Causal Relationship

Finally, Plaintiff must "show a causal relationship between the protected conduct and the

material adverse action." *Boquist*, 32 F.4th at 777. In other words, "the plaintiff must show that

the protected conduct played a part, substantial or otherwise, in the defendant's wrongdoing." *Id*.

Neither party disputes that Defendants imposed the 12-hour rule against Plaintiff — and *only*

Plaintiff — as a direct result of his statements on June 19, 2019. As such, Plaintiff has sufficiently shown all the elements for a prima facie case of retaliation.

### D. Affirmative Defense: Objectively Legitimate Need to Implement Safety Measures

Having established the elements for a prima facie case of retaliation, the burden shifts to Defendants to show that there was an "objectively legitimate need to implement security measures in response" to Plaintiff's statements, and that a retaliatory intent was not the "but-for cause" of Defendants' actions. *Id*. at 778. Evidence of some retaliatory animus is permissible, as long as Defendants "would have taken the same adverse action even in the absence of their animus or retaliatory motive." *Id*.

Here, the evidence indicates that a genuine concern for public safety was not the "but for" cause of Defendant's actions. Despite having the ability to call an emergency meeting and implement safety measures within one hour of Plaintiff's "threatening" remarks, Defendants waited three weeks to hold a conduct committee hearing. Defendant Prosanski made a point to publicize Plaintiff's name in the hearing agenda, and HR staff made Ms. Baumgart's Confidential Memorandum available for the public to view. Although Defendants agreed that Plaintiff no longer posed a current threat, they imposed a sanction inhibiting Plaintiff's right to freely access his place of work.  Most telling of all, Defendants never increased OSP security when Plaintiff was in the building and concede that the rule was "barely and only briefly enforced." Defs.' Mot. 18. The 12-hour rule was a thinly veiled publicity stunt that did nothing to increase public safety in the State Capitol. Defendants' affirmative defense is without merit.

### E. Not a Reasonable Time, Place, and Manner Restriction

Defendants also argue that the 12-hour rule is a reasonable time, place, and manner restriction. Defs.' Mot. 12. First Amendment protections are strongest in traditional public

16 – OPINION AND ORDER

forums, such as state capitol buildings, "which by long tradition or by government fiat have been devoted to assembly and debate." *Cornelius v. NAACP Legal Defense and Edu. Fund, Inc.*, 473 U.S. 788, 802 (1985) (internal quotations omitted). However, even in these historically protected settings, state officials may "enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Edu. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45, (1983)*.* Contrary to Defendants' assertions, it does not appear that the 12-hour notice rule is a reasonable time, place, or manner restriction at all. A rule restricting a *single* state senator's access to the Capitol building shortly after he engaged in distasteful political speech is hardly "neutral." Constitutional time, place, manner restrictions typically involve a neutral statute applicable to the general public or a specified group; Defendants provide no case law offering support for the application of such restrictions against a single individual. Moreover, as discussed *supra*, the 12-hour notice restriction did not further any significant government interest, i.e., increasing public safety. Even if the 12-hour rule was a reasonable time, place, and manner restriction (it is not), Defendants are prohibited from using such a restriction based on a "retaliatory animus," as they did here. *See Boquist*, 32 F.4th at 785.

## II.    Freedom of Assembly

The First Amendment encompasses a bundle of protections, including the right to freely assemble. *See* U.S. Cont. amend. I. In concert with his First Amendment retaliation claim, Plaintiff avers that the 12-hour rule violated his right to freely assemble with "constituents, elected officials, and others at the State Capitol Building on short notice." Pl.'s Mot. 35 (quoting *Boquist*, 32 F.4th at 784). "The right to assemble, cannot be denied without violating those fundamental principles which lie at the base of all civil and political institutions." *Givens v.*

*Newsom*, 459 F. Supp. 3d 1302, 1314 (E.D. Cal. 2020) (quoting *De Jonge v. Oregon*, 299 U.S.

353, 364 (1937)) (internal quotation omitted).

> Today, the freedom of association has largely subsumed the freedom of assembly. Parties bringing an expressive-association claim under the First Amendment must demonstrate that they are asserting their right to associate "for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." The right to expressive association is not an absolute right and can be infringed upon if that infringement is: (1) unrelated to the suppression of expressive association; (2) due to a compelling government interest; and (3) narrowly tailored.

*Givens*, 459 F. Supp. 3d at 1314 (citing *Roberts v. Jaycees*, 468 U.S. 609, 618, 623 (1984)).

Here, Plaintiff has shown that the 12-hour rule infringed upon his right to freely associate (for

purposes of speech) with his constituents at the Capitol at any time of day. Moreover, the rule

did not further a compelling government interest; the evidence indicates that it was purely

political, and most certainly related to the suppression of Plaintiff's speech. The Court finds no

genuine issue of material fact that the 12-hour rule infringes upon Plaintiff's right to freely

assemble.

## III.    Mootness

Defendants next argue that regardless of whether the rule violated Plaintiff's rights, his

claims still fail because the 12-hour rule was rescinded, and the matter is now moot. Defs.' Mot.

19. Defendants are incorrect. At the very least, Plaintiff's request for nominal damages keeps his

claims alive. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) ("a request

for nominal damages satisfies the redressability element of standing where a plaintiff's claim is

based on a *completed* violation of a legal right."); *Bernhardt v. Cnty. of Los Angeles*, 279 F.3d

862, 872 (9th Cir. 2002) (A live claim for nominal damages will prevent dismissal for

mootness"). Defendants concede that Plaintiff's demand for nominal damages keeps this case

alive, however, they argue that Plaintiff can no longer recover injunctive or declaratory relief. Defs.' Reply to Mot. for Summ. J. 10–11, ECF No. 68.

In general, "[a] request for injunctive relief remains live only so long as there is some present harm left to enjoin." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 864 (9th Cir. 2017). While it is true that the 12-hour rule is no longer in effect (and therefore not presently violating Plaintiff's First Amendment rights), Defendants only rescinded the rule after this litigation commenced. "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). The U.S. Supreme Court has set a "stringent standard" to determine whether a case has been mooted by the defendant's voluntary cessation of a challenged practice: "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* From this standard, the Ninth Circuit has coined a "capable of repetition, yet evading review exception" to mootness. *Bernhardt*, 279 F.3d at 871. Accordingly, a "heavy burden" rests on Defendants — the party asserting mootness — to prove that the imposition of the 12-hour rule could not reasonably be expected to recur. *Friends of the Earth*, 528 U.S. at 189.

Defendants argue that the 12-hour rule is incapable of repetition because two Defendants are no longer on the Senate Conduct Committee, and if the Committee implemented a similar measure against Plaintiff today, it would be under an entirely new set of circumstances. Defs.' Mot. 21. However, HCR-20 implemented a five-year statute of limitations for individuals to file complaints under Rule 27, meaning that legislative staff have until June 19, 2024, to file a complaint against Plaintiff for his actions on June 19, 2019.  Pl.'s Resp. 7; Jones Decl. Ex. 7, at

7. Now that the Rule 27 amendments are fully operative, the current Senate Conduct Committee has the authority to implement interim safety measures against Plaintiff in the event that a complaint is filed. Pl.'s Resp. 7. Plaintiff makes a reasonably plausible argument that the 12-hour rule, or a measure of similar nature *could* be implemented against Plaintiff again in the future. While an injunction enjoining the enforcement of the repealed 12-hour rule is no longer appropriate, this case is far from moot. At the very least, Plaintiff is entitled to declaratory relief for the violation of his constitutional rights.

## IV.    Immunity

### A.    Legislative Immunity

Defendants next argue that even if they violated Plaintiff's constitutional rights, they are entitled to legislative immunity. Defs.' Mot. 22. "Under the doctrine of legislative immunity, members of Congress and state legislators are entitled to absolute immunity from civil damages for their performance of lawmaking functions." *Jones v. Allison*, 9 F.4th 1136, 1139–40 (9th Cir. 2021). The Ninth Circuit has developed a four-factor balancing test to distinguish legislative acts from other non-legislative or "ministerial" acts: "(1) whether the act involves ad hoc decisionmaking, or the formulation of policy; (2) whether the act applies to a few individuals, or to the public at large; (3) whether the act is formally legislative in character; and (4) whether it bears all the hallmarks of traditional legislation." *Kaahumanu v. Cnty. of Maui*, 315 F.3d 1215, 1220 (9th Cir. 2003) (internal quotation marks omitted).

Defendants incorrectly rely on *Hernandez v. Oregon House of Reps.*, where Judge Aiken granted legislative immunity to Conduct Committee members involved in the expulsion of a member of the Oregon legislature. No. 6:21-CV-00238-AA, 2021 WL 5570112, at *7 (D. Or.

Nov. 29, 2021). However, the facts of *Hernandez* are distinguishable from this case. As Judge

Aiken described,

> The allegations against Plaintiff were considered by a legislative committee, which reached its decision by a unanimous vote. The Committee's decision and recommendation were then transmitted to the House in the form of a **resolution for the consideration of the whole body**. It is also significant that, under the Oregon Constitution, the only way to expel a member of the Legislature is by a two-thirds vote of the chamber in which the individual is a member. **In contrast to a more conventional employer-employee disciplinary matter**, the process for expelling a member of the Oregon Legislature is decidedly legislative in both form and function.

*Id.* (emphasis added). In contrast here, the decision to implement the 12-hour rule was not made

by the entire legislative body, but rather, four Senators who, at the time, lacked the authority to

impose Rule 27 interim safety measures in the first place. Defendants were not engaged in

crafting generally applicable public policy; instead, the rule was an unauthorized ad hoc decision

to penalize one individual member of the Republic caucus. *See Kaahumanu*, 315 F.3d at 1220

(holding that a zoning ordinance was ad hoc because it "would have affected only a single permit

and a single parcel of land," whereas, "the enactment of a general zoning ordinance is a

legislative act."). The 12-hour rule does not even remotely resemble "the hallmarks of traditional

legislation." *Kaahumanu*, 315 F.3d at 1220. As such, Defendants are not entitled to legislative

immunity.

### B.  Judicial Immunity

Defendants' claim of judicial immunity is equally unconvincing. Defs.' Mot. 23. The

Supreme Court has extended the doctrine of absolute judicial immunity "to certain others who

perform functions closely associated with the judicial process," such as federal hearing

examiners, administrative law judges, and federal and state prosecutors. *Cleavinger v. Saxner*,

474 U.S. 193, 200 (1985). The Court has further extended judicial immunity to witnesses and

other individuals who perform "integral parts of the judicial process." *Id*. However, in

*Cleavinger*, the Court declined to extend judicial immunity to correctional officers serving on an

inmate discipline committee because the committee did not "function as a classic adjudicatory"

body and it failed to offer certain "procedural safeguards" to inmates under review. *Id*. at 203,

206.

> The prisoner was to be afforded neither a lawyer nor an independent nonstaff
> representative. There was no right to compel the attendance of witnesses or to cross-
> examine. There was no right to discovery. There was no cognizable burden of
> proof. No verbatim transcript was afforded. Information presented often was
> hearsay or self-serving. The committee members were not truly independent. In
> sum, the members had no identification with the judicial process of the kind and
> depth that has occasioned absolute immunity.

*Id*. at 206.

Likewise, the Conduct Committee offered Plaintiff no procedural safeguards when it

implemented the disciplinary 12-hour rule. There was no formal investigation after the June 19,

2019, events; in fact, no staff member even filed a Rule 27 Complaint against Plaintiff.[15] At the

July 8, 2019, hearing, no party conducted discovery, Plaintiff was not afforded a lawyer, and he

had no right to cross-examine or confront witnesses against him. Defendants based their actions

on uncorroborated hearsay from an unidentified witness without first determining the credibility

of Ms. Baumgart's report. *See* FAC Ex. 3, at 5 (Senator Prozanski stating, "[r]emember, our task

today is not to be looking at the actual substance or merits of any report that has been made").

Because the Conduct Committee does not even remotely resemble a neutral and independent

body performing an adjudicatory function, Defendants' claim to judicial immunity fails.

### C. <u>Qualified Immunity</u>

---

[15] Even if the HCR 20 amendments were in effect on July 8, 2019, and Defendants had the authority to
implement interim safety measures, such measures would only be enforceable for 84 days from the date a
Rule 27 Complaint was filed. Jones Decl. Ex. 7, at 9–10. The 12-hour rule was in place for three-and-a-
half years, despite there being no Rule 27 Complaint or investigation.

Finally, Defendants aver that even if this Court does not grant absolute immunity, they are entitled to qualified immunity. Defs.' Mot. 25. But government officials are not entitled to qualified immunity if their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (quoting *White* v. *Pauly*, 580 U. S. 73, 78–79 (2017)). "[C]learly established law should not be defined at a high level of generality," but instead "must be "particularized" to the facts of the case." *Id*. at 79. "Although [the Supreme Court's] case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. at 7–8 (internal quotations omitted).

Here, neither party has identified a case that is factually on point, however, it is certainly *beyond debate* that hyperbolic political rhetoric is protected speech and that subsequent retaliatory action taken against a speaker engaging in such speech is prohibited by the First Amendment. *Wilson*, 142 S. Ct. at 1259; *Watts*, 394 U.S. at 708. At the time Defendants imposed the 12-hour rule, it was also clearly established in the Ninth Circuit that "retaliatory acts of elected officials against their own" that chills speech and diminishes "the full range of rights and prerogatives that came with having been publicly elected" violates the First Amendment. *See* Pl.'s Resp. 12–13 (citing *Blair*, 608 F.3d at 544, 545 n.4). Because the 12-hour rule constituted a retaliatory act against Plaintiff that deprived him of his rights as an elected official, Defendants were on notice that their actions violated clearly established law. Defendants may not claim qualified immunity as a shield from liability.

## V.    President Courtney Will Remain as a Defendant.

Finally, Defendants contend that Defendant Courtney played no role in the implementation of the 12-hour rule because he was not a voting member of the Conduct

Committee, and therefore, he should not be a party in this case. Defs.' Mot. 21–22; Defs.' Resp. to Pl.'s Mot. 15. Plaintiff argues that President Courtney was involved in the decision, because he presided over the hearing as an *ex-officio* member, which allowed him to cast a vote as a tiebreaker. Pl.'s Mot. at 16. Defendants respond that under the amendments to Senate Rule 8.05(4), Courtney's authority as an *ex officio* member explicitly "d[id] not apply to the Senate Committee on Conduct." Defs.' Resp. 15, n.6. However, Plaintiff avers that the Rule 8.05 amendment was not implemented until February 3, 2020, and therefore, President Courtney did have tie breaking authority at the hearing on July 8, 2019. Pl.'s Resp. 4, n.1; Jones Decl. Ex. 13 at 12.

Regardless, the Court is convinced that President Courtney was significantly involved in the events of this case. Under Senate Rule 8.15(3)-(5), the Conduct Committee could not meet or publish its hearing agenda without President Courtney's approval. Jones Decl. Ex. 39, at 33. Therefore, President Courtney was involved in the decision to publicize Plaintiff's name in the July 8, 2019, hearing agenda, he presided over the Conduct Committee hearing, and acquiesced to the imposition of the 12-hour rule. As such, President Courtney is liable for the deprivation of Plaintiff's constitutional rights.

## CONCLUSION

The Court finds that Defendants' implementation of the 12-hour rule was a retaliatory act against Plaintiff, in violation of his First Amendment rights to free speech and association. Defendants' Motion for Summary Judgment (ECF No. 59) is DENIED and Plaintiff's Motion for Summary Judgment (ECF No. 51) is GRANTED in full. Plaintiff is entitled to nominal damages in the amount of $1.00, declaratory relief, and reasonable attorney fees.

IT IS SO ORDERED.

Dated this 17th day of July, 2023.

_____/s/ Michael McShane\_\_\_\_\_

Michael McShane
United States District Judge